## 𝕎𝕪𝕥𝕙𝕖𝕧𝕚𝕝𝕝𝕖

## BENJAMIN C. COCHRAN AND PATSY C. GRAVES v. J. G. HIDEN, ET ALS.

### June 16, 1921.

1. ADVERSE POSSESSION—*Hostility of Possession—Title Which Deed Purports to Convey.*—In considering the question whether or not an entry and possession is adversary and hostile, it must be borne in mind that when one enters upon land, he is presumed to enter under the title which his deed purports on its face to convey, both as to boundaries or extent of the land and the nature of his title.

2. ADVERSE POSSESSION—*Hostility of Possession—Title Which Deed Purports to Convey—Case at Bar.*—Property was conveyed in trust to a husband for the joint use of the husband and his wife, during their joint lives, and for the joint use of the survivor of them and the children of the wife during the life of the survivor; and at the death of the survivor then to the heirs at law of the wife in fee simple. After the death of the husband the wife conveyed part of the land to one R. R. entered upon the land in question under the claim of title which his deed purported on its face to convey to him, namely, the fee simple ownership of the land; and R. and his successors in title from the entry of R. held uninterrupted possession of the property claiming to own the same in fee simple under deeds back to and including the deed to R. The possession of R. and his successors in title beginning with the entry of R. was, therefore, originally taken and held not in privity with the title of the wife, the mother of appellants, or of appellants, but such entry and possession was hostile and adverse to the title of appellants' mother from the entry of R. until the death of the mother, and thereafter was hostile and adverse to the title and claims of appellants.

3. DEEDS—*Construction—Joint Estates.*—Property was conveyed in trust to a husband for the joint use of the husband and his wife, during their joint lives, and for the joint use of the survivor of them and the children of the wife during the life of the survivor; and at the death of the survivor then to the heirs at law of the wife in fee simple.

*Held:* That, after the death of the husband, during the residue of the life of their mother, the latter and her children were, under the deed, joint owners of an estate for the life of the mother in the property embraced in such deed or derived from such property.

4. JOINT TENANTS AND TENANTS IN COMMON—*Adverse Possession— Conveyance of Whole Estate by One Co-Tenant.*—When a grantee has obtained a conveyance of the whole estate from one of the co-tenants, entry made under such a title is a disseizin of the other co-tenants. This doctrine is just and reasonable, for the grantee does not intend to enter or hold as a co-tenant. His entry is adverse. This is especially so if the conveyance is a deed of warranty. The same principle applies to joint tenants.

5. ADVERSE POSSESSION—*Hostility of Possession—Conveyance by Life Tenant.*—After the termination, of the life estate the possession of a grantee of the life tenant, holding under a deed conveying a fee simple is deemed adverse to the remainderman or reversioner.

6. LIMITATION OF ACTIONS—*Equity—Statutory Period.*—Appellants' remaindermen were both of age, and otherwise *sui juris,* when their mother, the life tenant, who had conveyed the land in question in fee simple, died. From that time until suit was instituted was nearly seventeen years, a period longer than the statutory period of limitation which is applicable in bar of appellants' equitable rights, equally as if they were legal rights to the land. Equity in such cases applies the same period of limitation as would be applied if the case were at law.

7. ADVERSE POSSESSION—*Entry in Privity With Title of Rightful Owner—Disavowal of Title—Case at Bar.*—While it is well settled that when an entry, which is the origin of the possession, is made in privity with the title of the rightful owner, the possession does not become hostile and adverse unless and until there is a clear, distinct and positive disavowal of the latter's title, and such disavowal is actually or constructively brought home to the notice of the latter. This doctrine, however, has no application to the case at bar because the entry involved was not in privity, but hostile and adverse to the title of the true owners.

8. TRUSTS AND TRUSTEES—*Constructive Trust—Purchaser of Trust Property.*—A purchaser of trust property, or property charged with a trust, with actual or constructive notice of the trust, will be held to be a constructive trustee and be constrained to execute or submit to the execution of the trust.

8. TRUSTS AND TRUSTEES—*Constructive Trust—Purchaser of Trust Property—Adverse Possession.*—The doctrine of the preceding syllabus, however, has no application against one who has had merely constructive notice of the true owners' title, and who has, as against such true owners, acquired title by adverse possession. Until the adverse possession covers the statutory period, it is true that the doctrine just mentioned is appplicable. But when the period of adverse possession has expired the doctrine is no longer applicable.

10. TRUSTS AND TRUSTEES—*Constructive Trust—Purchaser of Trust Property—Statute of Limitations.*—In the case of a purchase directly from a trustee or other fiduciary, where the purchaser's notice of the trust is constructive only (as when derived merely from a deed or deeds in his chain of title being of record), the statute of limitations begins to run at once in favor of such a purchaser and against the *cestui que trust* upon the entry of the purchaser into possession under the hostile claim of title. *A fortiori* is this true where the purchase is not from a trustee or other fiduciary, but from a beneficial owner, albeit from one owning a less estate than that which the deed from such owner purports to convey.

11. TRUSTS AND TRUSTEES—*Purpose of Trust—Termination of Trust.*—Property was conveyed in trust to a husband for the joint use of the husband and his wife, during their joint lives, and for the joint use of the survivor of them and the children of the wife during the life of the survivor; and at the death of the survivor then to the heirs at law of the wife in fee simple. The purpose of the trust was recited to be that a sure and permanent home and support might be provided for the trustee's "wife and children beyond the contingency of his personal success or failure in business."

*Held:* That upon the death of the trustee the contingency no longer existed and the object and purpose of the trust was fully accomplished. The trust ceased, the estate of the trustee ceased to exist and his title became extinct.

12. ADVERSE POSSESSION—*Good Faith of Purchaser Claiming Title Under Deed—Actual Possession.*—Even good faith on the part of a purchaser, in obtaining and claiming title under his deed, is not essential to his acquisition of title by adverse possession to the extent of his *pedis possessio.*

13. ADVERSE POSSESSION—*Good Faith of Purchaser Claiming Title Under Deed—Constructive Possession.*—Where the purchaser relies on constructive possession, arising from the color of title given by his deed, if his claim of title thereunder is *bona fide,* and the other requisites therefor exist, his title will ripen

by adverse possession, however bad the title may in fact be; and mere constructive notice to a purchaser that his title is bad, will not of itself impeach the good faith of his claim of title.

14. ESTOPPEL—*Prejudice or Injury.*—Where it did not appear from the bill, or exhibits therewith, that appellants were in any way prejudiced or injuriously affected in their rights by a letter of appellee, or by notice of motion by appellee to substitute a trustee deed, the doctrine of estoppel can have no application.

15. ADVERSE POSSESSION—*Admissions by Holder of Title by Adverse Possession.*—Where title has become perfect by adverse possesion for the statutory period it is not lost by an admission by the holder that the possession was not adverse, although the admission is in writing; or by an admission of defects or infirmities in the title under which the holder held adversely; or by a subsequent recognition of a previous title which, originally rightful, has lost that character by a delay to enforce it; or by negotiations for the purpose of quieting title.

Appeal from a decree of the Circuit Court of Culpeper county. Decree for defendants. Complainants appeal.

*Affirmed.*

This is a suit in equity instituted by the appellants to set up and establish the equitable ownership in them of a certain tract of fifty acres of land, and an implied or resulting trust in, or an equitable lien upon, another and adjacent tract of 121 acres of land, all located in Culpeper county, Virginia; the trust or lien asserted being to the extent of about $2,000 of a trust fund at one time belonging to appellants in remainder, which sum was many years ago invested in the purchase of such 121 acre tract.

There was a demurrer to the bill by J. G. Hiden, one of the appellees, on several grounds, among which is the ground that the claims and demands of the appellants are barred by the statute of limitations. The decree under review sus-

tained the demurrer to the bill on that ground, and dismissed the bill.

The material facts, as they appear from the allegations of the bill, are as follows:

By deed dated July 11, 1871, and duly recorded August 12, 1877, Benjamin Crawford, a grandfather of appellants, in consideration of the natural love and affection which the said Benjamin Crawford bore to his daughter, Nannie Cochran (elsewhere in the record called "Nannie S. Cochran"), the wife. of James Cochran (the two last named being the mother and father of appellants, who were their only children), conveyed to the said James Cochran, a certain tract of 200 acres of land, which included the fifty-acre tract above mentioned, upon the following trust as set out in such deed, namely:

"To have and to hold the said tract or parcel of land * * * unto him the said James Cochran, in trust, for the joint use of him, the said James Cochran and Nannie, his wife, during their joint lives, free and clear of and from all manner of charge and encumbrance of him the said James Cochran, and for the joint use of the survivor of them and the children of the said Nannie Cochran during the life of said survivor; and at the death of said survivor that the same shall pass in fee simple to the ―― at law of the said Nannie Cochran.―Full power and authority is hereby invested in said trustee by and with the consent of said Nannie Cochran evidenced by her uniting with him by privy examination in the deed conveying the same, to sell and convey the said property, but the proceeds of sale shall be held and invested upon like trust as hereinbefore set forth with continuing power to change the investment upon the same terms; and the said Benjamin Crawford doth hereby declare that this conveyance is not made from any want of confidence in his said son-in-law, James Cochran, but that it is made with his full consent and at his request, in order that a sure and

permanent home and support may be provided for his wife and children beyond the contingency of his personal success or failure in business."

By deed dated March 20, 1879, and duly recorded April 12, 1879, James Cochran and his said wife (the latter uniting therein by privy examination per certificate of a notary public), for the consideration of $6,000 purchase money, conveyed away, to R. T. Barton, trustee, 150 acres. of said 200 acres of land, leaving the fifty-acre tract which is first above mentioned.

At or about the time of the deed last mentioned, the said James Cochran, at the price of about $5,850, purchased from one James Crawford and wife the 121 acre tract of land above mentioned, and used about $2,000 of the purchase money derived from the sale of the 150 acre parcel of land aforesaid, in making the cash payment for such 121 acre tract, leaving about $3,850 unpaid purchase money therefor owing to the said Crawford and wife.

James Cochran died on August 17, 1883, before any further purchase money was paid for said 121-acre tract of land, and up to his death no conveyance thereof had been made by Crawford and wife.

By deed dated May 28, 1884, and duly recorded July 24, 1884, the said Crawford and wife and the said Nannie Cochran united in a conveyance to one James F. Robertson of both the said 121 and fifty-acre tracts of land. This deed recites that the said Crawford and wife "did sell" the said 121 acres of land "to the said Nannie S. Cochran, but never made her a deed for the same, and there remains due to the said Crawford and wife on the said land the sum of $3,850.00." It also appears from the recitals in such deed that the said Nannie Cochran sold to the said James F. Robertson both the said 121-acre and fifty-acre tracts of land, making 171 acres of land, at the price of $40 per acre, aggregating $6,840, subject to a survey thereafter to be

made, $2,280 of which purchase mony was paid cash by said Robertson, he giving his three bonds for the residue, bearing interest. It also appears from the recitals in this deed that the fifty-acre parcel of land included in the larger tract of 200 acres above mentioned "was conveyed by said Benjamin Crawford to James Cochran, trustee, by deed of 11th July, 1871." By the deed of May 28, 1884, also, a vendor's lien was "reserved to the said Nannie S. Cochran on the said land to secure the payment of the three bonds of said Robertson before mentioned." The deed, however, purports to convey both the said 121 and fifty-acre tracts of land to the said Robertson in fee simple "with general warranty of title."

James F. Robertson took actual possession of said 121 and fifty-acre tracts of land upon the execution of the last named deed to him, and continued in such possession until April, 1890, claiming title to all of such land in fee simple under such deed. He on the last named date conveyed the same land as in fee simple, to his wife, who continued such possession and claim of title until November 10, 1890, when she by deed in which her husband united conveyed the same land as in fee simple to F. A. Dangerfield and R. J. Gray, who continued such possession and claim of title until they conveyed it. The property was conveyed as in fee simple by the said Dangerfield and Gray and by various other mesne conveyances of the same character down to one E. P. Duncan, who, by deed dated October 24, 1911, conveyed the same as in fee simple to the said J. G. Hiden, one of appellees, who has ever since held actual possession thereof under claim of title under the last named deed and under the various deeds in his chain of title aforesaid. All of the deeds in said chain of title from said James F. Robertson down to and including the deed to J. G. Hiden, aforesaid, were duly recorded.

The bill contains the following express allegation on the subject of adverse possession of said fifty and 121-acre tracts of land, to-wit:

"* * that said J. G. Hiden and his predecessors in title, for more than fifteen years, have held uninterrupted possession of said property, claiming to own the same in fee simple under all of said deeds back to and including said exhibit No. 1" (the deed of July 11, 1871, from Benjamin Crawford to James Cochran, trustee, aforesaid), "but without ever in any way putting complainants on notice, or upon inquiry, that the same was being held adversely to complainants."

It appears from the bill that appellant, Benjamin C. Cochran, was born September 11, 1868, and hence became 21 years of age on September 11, 1889. That appellant, Patsy C. Graves, was born August 17, 1870, and so became twenty-one years of age on August 17, 1891. The latter married some time after she became twenty-one years of age.

The said Nannie Cochran, the mother of appellants, died in Bristol, Va., on March 24, 1902.

Appellant, Benjamin C. Cochran, left Culpeper in the year 1887, and after a few years located in Bristol, Va., where he has resided the greater part of his time since he left Culpeper.

Appellant, Patsy C. Graves, and her mother, moved from Culpeper to Bristol on or about April 2, 1894, where the former afterwards married and where she has resided ever since.

The said Nannie Cochran was an invalid all the time after she moved to Bristol, and for some years prior to that time. She never had any business experience and understood business transactions very imperfectly.

The part of the purchase money for the 121 and fifty-acre tracts of land sold and conveyed to James F. Robertson, as aforesaid, after payment to Crawford and wife of the bal-

ance of purchase money for the 121 acre tract of land, with interest, owing to them, as aforesaid, was never reinvested in accordance with the trust and limitations with which the same was charged by the deed of July 11, 1871.

There is filed with the bill, as exhibit No. 4, the following letter from Messrs. Hiden & Bickers, attorneys for the said J. G. Hiden:

"EXHIBIT No. 4.

"J. G. Hiden
"R. A. Bickers

"Hiden & Bickers
"Attorneys and Counsellors at Law
"Culpeper, Virginia.

"July 23, 1918.

"Mr. Benjamin Cochran,
          "Druggist,
                    "Bristol, Virginia.

"Dear Mr. Cochran:

"We are writing you at the request of Mr. J. G. Hiden, the present owner of the 'Belle Parc Farm,' near this town, which was formerly owned by your mother, Nannie S. Cochran.

"It appears from the records of Culpeper county that in 1871 Benjamin Crawford conveyed to James Cochran, as trustee, 200 acres of land, a part of the 'Belle Parc Farm,' to be held for the use and benefit of James Cochran and Nannie S. Cochran during their natural lives, and then to the survivor and at the death of the survivor to the heirs at law of Nannie S. Cochran, with authority to the trustee to sell 'upon Nannie S. Cochran signing and acknowledging said deed according to law.'

"It further appears that James Cochran, trustee, and Nannie S. Cochran conveyed 150 acres of the above 200 acres

to R. T. Barton, trustee, in 1879, leaving fifty acres in the name of James Cochran, trustee, for the benefit of Nannie S. Cochran, etc.

"It further appears that in 1884 Nannie S. Cochran having bought from James W. Cradford and Cornelia Crawford, his wife, 204 acres, the balance of the 'Belle Parc Farm,' joined in deed from James Crawford and Cornelia Crawford in conveying the 204 acres standing in the name of James Cochran, trustee, to James F. Robertson, in which deed James Cochran, trustee, did not join. Therefore, the legal title is still outstanding as to the fifty acres standing in the name of James Cochran, trustee.

"At this time wishing to remove the above mentioned defect as to the above-mentioned fifty acres, we would ask for the following information:

"The time, date and place of the death of James Cochran.

"The time, date and place of the death of Nannie S. Cochran, if she is not living.

"The names, ages and place of residence of the various heirs at law of Nannie S. Cochran and James Cochran.

"If you will furnish us the above information we will draw the necessary papers to remove this technical defect as to the title to the fifty acres of land and forward to the various heirs at law of Nannie S. Cochran to sign; of course, presuming that they have no objection at this time to remedying this defect in the title. Their doing this would save a great deal of expense and time to the present owner, inasmuch as if we cannot get the proper papers signed in the nature of a quit claim deed we would have to take the necessary steps in a chancery court to remove this cloud from the title.

"Hoping you will see fit to furnish us with the above information in the enclosed stamped envelope, we beg to remain,

"Very truly yours,

"RAB/M.                    "HIDEN & BICKERS."

The bill contains the following express allegations with respect to the positions taken by appellants:

"VIII. That complainants were infants less than three years of age when said deed of July 11, 1871, Exhibit No. 1, was made, and knew nothing about same being made, and knew nothing of the trust thereby created or of the remainder interest therein conveyed to them or for their benefit, and they never learned that they had any right, title, claim or interest in and to said property, or any part thereof, until Benjamin C. Cochran, one of the complainants, received the accompanying letter dated July 23, 1918, from Messrs. Hiden & Bickers, attorneys for J. G. Hiden, said J. G. Hiden being the person now in possession of said property, and one of the defendants to this bill. Said letter is filed herewith as Exhibit No. 4, and is here referred to for all purposes. Prior to the receipt of said letter, nothing ever occurred to suggest or put them on inquiry in regard to their rights in and to said property. Since the receipt of said letter, they have had the matter investigated, and have ascertained such of the foregoing facts as they did not know. * * *"

"IX. From the facts alleged and the exhibits filed in the foregoing sections of this bill, the following alternative allegations are proper, and therefore complainants are advised and allege:

"A. That by virtue of said deed of July 11, 1871, Exhibit No. 1, complainants acquired the remainder in the property thereby conveyed, and not properly sold and conveyed in accordance with the provisions thereof; and in the proceeds of sale of any part thereof properly sold and conveyed, and in any property in which such proceeds were reinvested; and that their title thereto became absolute at the death of their mother on March 24, 1902; that at the

time of the execution of said deed of May 28, 1884, Exhibit No. 3, said Nannie Cochran, being the life tenant, held the title and possession of said property in privity with complainants; that said James F. Robertson took said title and possession from said Nannie Cochran knowing that only the life estate of Nannie Cochran was being vested in him as owner, and that the remainder was vested in complainants, and said James F. Robertson and his successors in title down to and including said J. G. Hiden continued to take said title and hold said property in privity with complainants, until a few months ago, when said J. G. Hiden refused to recognize the rights of complainants in and to said property; or

"B. That said James F. Robertson and his successors in possession of said property down to and including said J. G. Hiden took said property charged with the express trust created by said deed of July 11, 1871, Exhibit No. 1, and referred to in said deeds of March 20, 1879, Exhibit No. 2, and May 28, 1884, Exhibit No. 3, and continued to hold possession of said original fifty acres and the said 121 acres, in which a part of the proceeds of the sale of said 150 acres were invested, charged with said express trust so created by said deed of July 11, 1871, Exhibit No. 1, and the said J. G. Hiden now holds the said fifty acres, and the proportional part of said 121 acres in which said sum of about $2,000 was charged with said trust; or

"C. As to said sum of about $2,000.00 which was paid out of said $6,000.00 fund on the purchase price of said 121 acres: By virtue of said express trust so created in said deed of July 11, 1871, Exhibit No. 1, and recited in said deeds as Exhibits Nos. 2 and 3, said 121 acres was and is charged with an equitable lien to secure the payment of said sum of about $2,000.00, with interest thereon from March 24, 1902, the date of the death of Nannie Cochran; or

"D. In any event, that said property was so charged with said trust by said deed of July 11, 1871, and complainants' rights not having been extinguished by any legal or equitable means, they are now entitled to such equitable relief as the nature of their case requires and merits.

"X. That said J. G. Hiden has admitted and recognized that said property was and is charged with said trust by giving complainants notice of a motion to substitute a trustee in said deed of July 11, 1871, which motion is now pending on the law side of this court. Said notice was directed to complainants separately, and was served on each of them on December 16, 1918, by the sergeant of the city of Bristol, Virginia. Said notice was in the words and figures following, to-wit:

" 'To Benjamin Cochran,
" 'Patsy C. Graves:
" 'Take notice that I shall on Saturday, December 21, 1918, move the Circuit Court of the county of Culpeper, State of Virginia, to have R. A. Bickers substituted as trustee in a certain deed of trust from Benjamin Crawford to James Cochran, trustee, dated July 11, 1871, and recorded in the clerk's office of the Circuit Court of Culpeper county, Virginia, in deed book 18, page 446, in the place and stead of the said James Cochran, named as trustee in the said deed, which said trustee is dead. This notice is given you as one of the parties interested or supposed to be interested in the execution of said trust.

" 'Given under my hand this 14th day of December, 1918.

" 'J. G. HIDEN'."

It is not alleged in the bill and it does not otherwise appear that the last mentioned notice was acted upon or that

any trustee has been substituted in the deed therein referred to; or that appellants were in any way injuriously affected in their rights by such notice or by the letter aforesaid of Hiden & Bickers.

In the suit before us, the appellants on February 18, 1919, filed their bill by leave of court. The appellee, J. G. Hiden, appeared on February 25, 1919, and filed his demurrer to the bill aforesaid. The decree aforesaid, under review, was entered on November 5, 1919.

*Henry Roberts*, for the appellants.

*W. M. Fletcher* and *Grimsley & Miller*, for the appellees.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The questions presented for our consideration by the assignments of error, will, so far as needful for the decision of the cause, be passed upon in their order as stated below.

1. Was the possession of the fifty and 121-acre tracts of land in the bill mentioned by the appellee, J. G. Hiden, and by his predecessors in title, beginning with James F. Robertson on May 28, 1884, originally taken and subsequently held in privity with the title of the mother of appellants or in privity with the title of appellants?

This question must be answered in the negative.

[1, 2] As said in *Virginia Coal & Iron Co.* v. *Hylton*, 115 Va. 418, 79 S. E. 337, Am. Cas. 1915a, 747: "In considering the question whether or not Hylton's entry and possession was adversary and hostile, the familiar principle must be borne in mind that when one enters upon land, he is presumed to enter under the title which his deed purports on its face to convey, both as to boundaries or extent of the land and the nature of his title. * * *"

The bill in the cause before us, however, expressly alleges, in substance, that Robertson entered upon the land in ques-

tion under the claim of title which his deed purported on its face to convey to him, namely, the fee simple ownership of the land; and that Hiden and his predecessors in title, including Robertson, have from the entry of Robertson held uninterrupted possession of said property "claiming to own the same in fee simple under * * deeds back to and including" the deed to Robertson.

The possession of Hiden and his predecessors in title, beginning with the entry of Robertson on May 28, 1884, was, therefore, originally taken and held, not in privity with the title of the mother of appellants, or of appellants, but such entry and posession was hostile and adverse to the title of appellants' mother from May 28, 1884, until the death of the mother, and certainly thereafter (if not from the death of the father, or from their attaining the age of twenty-one years) it was hostile and adverse to the title and claims of appellants.

[3] After the death of their father, during the residue of the life of their mother, the latter and appellants were, under the deed of July 11, 1871, filed as Exhibit 1 with the bill, joint owners of an estate for the life of the mother in the property embraced in such deed or derived from such property.

[4] As said in Sedge & Wait on Trial of Title to Land, sec. 287: "When the grantee has obtained a conveyance of the whole estate from one of the co-tenants, entry made under such a title is a disseizin of the other co-tenants. This doctrine is just and reasonable, for the grantee does not intend to enter or hold as a co-tenant. His entry is adverse * * *. This is especially so if the conveyance is a deed of warranty. * * * The same principle applies to joint tenants."

[5] It is true that in the case before us the appellants were infants when the adverse entry by Robertson was made

under the deed from the mother of appellants. It is necessary for us, however, to stop to consider the subject of whether the statute of limitations began then to run against appellants, notwithstanding their infancy, or during the lifetime of the mother after appellants became of age, because the same principle which is embodied in the quotation just made unquestionably applies to the possession of a grantee of a life tenant held after the death of the latter, and if the statute did not begin to run until the death of the mother, appellants were at her death both over twenty-one years of age and from that time to the institution of this suit was longer than the period required to obtain title by adversary possession. In such case, upon the death of the mother, the co-owner aforesaid for her life, such possession was adverse to the appellants, who were entitled in fee in remainder. As said in 2 Am. & Eng. Ency. L. & Practice, sec. (2), p. 485: "After the termination of the life estate the possession of * * * a grantee of the life-tenant, holding under a deed conveying a fee simple, is deemed adverse to the remainderman or reversioner. * * *" Authorities to the same effect might be indefinitely multiplied.

[6] The appellants were both of age, as aforesaid, and otherwise *sui juris*, when their mother died on March 24, 1902. From that time until this suit was instituted in February, 1919, was nearly seventeen years, a period longer than the statutory period of limitation, which is applicable in bar of appellants' equitable rights, equally as if they were legal rights to the land. Equity in such cases applies the same period of limitation as would be applied if the case were at law. As said in 3 Story's Eq. Jur. (14th ed.), sec. 1972: "In a great variety of * * * cases, courts of equity act upon the analogy of the limitations at law. Thus, for example, if a legal title would in ejectment be barred by twenty years' adverse possession, courts of equity will act upon the like limitation and apply it to all cases of relief sought upon

equitable titles on claims touching real estate." See also *Mc-Clanahan's Adm'r* v. *N. & W. Ry. Co.*, 122 Va. 705, 96 S. E. 453; *Redford* v. *Clark*, 100 Va. 115, 40 S. E. 630.

[7] 2. The well-settled rule is urged by appellants upon our attention, that when an entry, which is the origin of the possession, is made in privity with the title of the rightful owner, the possession does not become hostile and adverse unless and until there is a clear, distinct and positive disavowal of the latter's title, and such disavowal is actually or constructively brought home to the notice of the latter; and a great number of authorities are cited which enunciate this familiar doctrine. But, in view of the fact that the entry involved in the cause before us was not in privity, but hostile and adverse to the title of the true owners, as aforesaid, such doctrine and authorities have no application to the case.

[8, 9] 3. There is another well-known doctrine which is urged upon our consideration by appellants, namely: that a purchaser of trust property or property charged with a trust, with actual or constructive notice of the trust, will be held to be a constructive trustee and be constrained to execute or submit to the execution of the trust. 3 Story's Eq. Jur. (14th ed.), sec. 1665-6; 2 Minor's Inst. (4th ed.) p. 233, and authorities cited; 1 Minor on Real Prop., sec. 488-9, and authorities cited; *Duncan* v. *Jaudon*, 15 Wall. 165, 21 L. Ed. 142; *Newcomb* v. *Brooks*, 15 W. Va. 32; *Tompkins* v. *Powell*, 6 Leigh (33 Va.) 580; *Heth* v. *R., F. & P. R. R. Co.*, 4 Gratt. (45 Va.) 482, 50 Am. Dec. 88. This doctrine, however, has no application against one who has had merely constructive notice of the true owner's title, and who has, as against such true owners, acquired title by adverse possession. Until the adverse possession covers the statutory period, it is quite true that the doctrine just mentioned is applicable. But when the period of adverse possession has expired, the doctrine is no longer applicable. The authorities last cited are

to be read with this elementary principle in mind and they are in entire accord therewith.

As said in 2 C. J., sec. 478, pp. 226-7: "While it was at one time thought that trust estates were not within the operation of the statute" (of limitations), "ever since a decision by Lord Hardwicke to the contrary" (*Lewellen* v. *Mackworth*, 2 Eq. Cas. Abr. 579, par. 8, 22, Reprint 488, 15 Viner Abr. 125 note), "it has uniformly been held that an adverse posession which is sufficient to bar the legal estate of the trustee, also bars the equitable estate of the *cestui que trust.*"

[10] There is a line of decisions which hold that in the case of a purchase by one directly from a trustee or other fiduciary, where the trustee conveys in breach of his trust and the purchaser has actual knowledge of this, the latter, because of his active participation in the breach of trust, will be dealt with as if he were the actual trustee and will be treated as having acquired possession of the property in privity of estate with the *cestui que* trust, so that the doctrine above mentioned which requires the disavowal of the true owners' title and the notice of the disavowal to be brought home to the *cestui que trust*, above referred to, is applicable. 2 Perry on Trusts (6th ed.) Am. note (a) to sec. 860. But all the authorities are practically in accord in the holding that even in the case of a purchase directly from a trustee or other fiduciary, where the purchaser's notice of the trust is constructive only (as when derived merely from a deed or deeds in his chain of title being of record—as is true of the cause before us), the statute of limitations begins to run at once in favor of such a purchaser and against the *cestui que trust* upon the entry of the purchaser into possession under the hostile claim of title. *Idem,* Am. note (a); *Redford* v. *Clarke,* 100 Va. 115, 40 S. E. 630. *A fortiori* is this true where the purchase is not from a trustee or other fiduciary, but from a beneficial owner, as

in the case before us, albeit from one owning a less estate than that which the deed from such owner purports to convey.

[11] 4. In the case before us, indeed, the trust in question had ceased and determined prior to the deed of the life tenant to Robertson. The trust, as an express trust, ended upon the death of James Cochran, the trustee. As appears from the conveyance from Benjamin Crawford, to James Cochran, trustee, of date July 11, 1871, which created the trust, the object and purpose of the trust was "that a sure and permanent home and support may be provided for his" (James Cochran's) "wife and children beyond the contingency of his personal success or failure in business." Upon James Cochran's death that contingency no longer existed and the object and purpose of the trust had been fully accomplished. The trust thereupon ceased, and, under well settled principles, the estate of the trustee ceased to exist and his title became extinct. *Angle* v. *Marshall*, 55 W. Va. 671, 680, 47 S. E. 882; *Doe, Lessee of Poor*, v. *Considine*, 6 Wall, 458, 18 L. Ed. 869, 873; *Young* v. *Bradley*, 101 U. S. 782, 25 L. Ed. 1044.

So that the case before us is not, in truth, complicated with the consideration of when the statute of limitations will commence to run in favor of a purchaser of property, embraced in an existing express trust. The case before us is that of a conveyance of property by the owner of an estate therein, although of an estate which is less than that purported to be conveyed by the deed. Hence, there is no occasion for us here to deal with the authorities (many of which have been cited in argument, but which need not be here mentioned), which enunciate the rule that the statute of limitations will not run in favor of an express trustee against the *cestui que trust* so long as the trust relationship continues to exist, but will, in general, run in favor of an

implied trustee against the *cestui que trust*, with certain exceptions to which some allusion has been made above.

[12, 13] 5. In the case before us, under the well-settled rules on the subject, not even good faith on the part of the purchaser, in obtaining and in claiming title under his deed, is essential to his acquisition of title by adverse possession to the extent of his *pedis possessio*. And where the purchaser relies on constructive possession, arising from the color of title given by his deed, if his claim of title thereunder is *bona fide*, and the other requisites therefor exist, his title will ripen by adverse possession, however bad the title may in fact be. Moreover it is well settled, in Virginia at least, that mere constructive notice to a purchaser that his title is bad, will not of itself impeach the good faith of his claim of title. The same is often true, indeed, where the notice that the title is bad is actual notice, but the case before us does not require any further consideration of that subject. The bill does not allege any actual, but only constructive notice to the purchaser of the title and claims of the true owners. Hence, we must infer from the allegations of the bill that the claim of title of the purchaser, Hiden and his predecessors in title, under the deeds in their chain of title, was *bona fide*. It is, therefore, unnecessary for us to consider whether the possession involved in the cause was *pedis possessio* or constructive, or partly of the one or of the other character of possession. And, as we must conclude, in any view of the subject, the statute of limitations began to run against applicants upon the death of their mother, as aforesaid, and at the time this suit was instituted operated as a complete bar to all of the rights of the appellants asserted in the bill.

But one other question remains for our decision, and that is this:

[14] 6. Is the appellee, Hilden, estopped from relying on his title by adverse possession, by the letter of July 23, 1918, exhibit No. 4 with the bill, or by the notice of motion to substitute a trustee set out in section X of the bill?

This question must be answered in the negative.

It does not appear from the bill, or exhibits therewith, that appellants were in any way prejudiced or injuriously affected in their rights by such letter or notice. Therefore, the doctrine of estoppel has no application to the case. *Bradshaw* v. *Booth*, 129 Va. 19, 105 S. E. 555.

The adverse possession of Hiden had existed for the statutory period of fifteen years after the death of Mrs. Cochran in March, 1902, and his title by adverse possession was perfected before the letter in question was written, or the notice in question was given. He was the owner of the property in fee, under the title by adverse possession, when the letter was written and the notice was given. Whether the letter was written and the notice was given on the part of Hiden under a misapprehension of fact, or of his legal rights, is immaterial. It could not of itself operate to divest him of his title to the land. Even if such action amounted to an admission by Hiden that the title to the land was not in himself at that time, and that the rights of appellants asserted in the bill were still in existence, that would not of itself have been sufficient to defeat Hiden's title.

[15] As said in 2 C. J., sec. 560, pp. 256-7: "Where title has become perfect by adverse possession for the statutory period, it is not lost by an admission by the holder that the possession was not adverse, although the admission is in writing; * * * or by an admission of defects or infirmities in the title under which the holder held adversely; or by a subsequent recognition of a previous title which, originally rightful, has lost that character by a delay to enforce it; * * or by negotiations for the purpose of quieting title." See also the authorities cited in this learned work to support this text.

The decree under review will be affirmed.

*Affirmed.*