# Richmond.

## Edgar N. Cox v. L. W. Cox.

November 16, 1922.

1. Adverse Possession—*Claim of Title—Notice of Hostility of Claim—Case at Bar.*—Where the possession of complainant was originally taken and held in subserviency to or in privity with the title of defendant, the statute of limitations did not begin to run in favor of complainant upon his claim of title to the property until the defendant had actual or constructive notice of such claim.

2. Adverse Possession—*Claim of Title—Notice of Hostility of Claim—Evidence of Actual Notice—Case at Bar.*—In the instant case, there was no evidence tending to show that defendant had actual notice of an adverse claim of title to the land in question by complainant, who originally held the property in question in privity with the title of the defendant, until about a year or eighteen months before the suit was instituted, except the testimony of complainant and the testimony of his attorney. The testimony of complainant bore on its face such *indicia* of unreliability, that it could not be regarded as furnishing any evidence. The testimony of the attorney failed to disclose precisely what was said on the occasions of his interviews with defendant, and from the substance of these conversations, as remembered by the attorney, the failure of defendant to understand, from what the attorney may have said, that the complainant claimed title to the property itself, was most natural and highly probable.

   *Held:* That the evidence failed to establish actual notice of complainant's claim of title to the property.

3. Adverse Possession—*Claim of Title—Notice of Hostility of Claim—Constructive Notice—Disclaimer.*—Where the possession is originally taken under and in privity with the title of the true owner, it may subsequently become adverse without actual notice thereof to the latter, but only in the event that the possession is accompanied by an unequivocal, clear, positive, continued disclaimer of the owner's title, such as the owner could not mistake, for the whole of the statutory period, so notorious that there is no other reasonable conclusion than that the owner, under the circumstances, must have had notice thereof.

4. Adverse Possession—*Disclaimer of True Owner's Title—Evidence to Establish Disclaimer.*—The disclaimer of the owner's title, to con-

stitute constructive notice, may be proved by circumstantial as well as by direct evidence, and it is not required to be proved so as to preclude all doubt; but that the possession is under claim of title hostile to that of the true owner, must, at least, be generally known in the vicinity of the land involved for the whole of the statutory period.

5. ADVERSE POSSESSION—*Disclaimer of True Owner's Title—Evidence to Establish Disclaimer—Case at Bar.*—In the instant case there was no evidence anywhere approaching the proof of such notorious disclaimer of title of the true owner by complainant as would give constructive notice to such owner so as to have set the statute running and to have kept it running for any period of fifteen years before suit was instituted. According to the evidence the disclaimer of title so far back as fifteen years before the suit, was made only to one person, the agent of the complainant, and privately made to him. There was no notoriety about that. The other evidence as to disclaimer by the complainant extended no farther back at most than eleven years prior to the suit.

Appeal from a decree of the Corporation Court of the city of Charlottesville. Decree for defendant. Complainant appeals.

*Affirmed.*

This is a *quia timet* suit instituted in 1920 by the appellant, Edgar N. Cox, against the appellee, L. W. Cox, having for its object the removal of a cloud upon the alleged title of the appellant in fee simple to certain real estate which the appellant claims was acquired by him by adverse possession.

The real estate consists of a certain lot in the city of Charlottesville, with a dwelling house and other improvements thereon, which was in the actual possession of the appellant by *pedis possessio*, at the time of suit and had been theretofore continuously in such possession since the year 1892, a period of about twenty-eight years.

The evidence shows, without conflict, that the appellee, the father of the appellant, is the true owner in fee

simple of the lot in controversy, unless he has lost his title thereto by reason of the adverse possession thereof by the appellant for the statutory period of fifteen years.

The lot was conveyed to appellee by deed from R. E. Vandegrift and wife, of date September 1, 1883, duly delivered on its date, thereby then vesting the fee simple title in appellee. The deed was recorded in the year 1913. This deed and its recordation constitute the alleged cloud upon the alleged title of appellant which is sought to be removed as aforesaid.

The evidence, without conflict, shows that the appellee, soon after obtaining said deed from Vandegrift and wife, built a dwelling house on the lot and thereafter rented the lot to tenants who occupied the premises until the year 1892, when the appellant, who was then only eighteen years of age, but who had recently made a runaway-marriage and had nowhere else to take his wife, went there to live, and, by actual residence a part of the time and by having the lot under his control or the control of his agent, a Mr. Allen, a lawyer of Charlottesville of high standing, when appellant was away, the appellant has had the actual possession of the lot aforesaid from 1892 down to the time of the institution of this suit.

There is a conflict in the evidence on the subject of whether the said possession was originally taken and held by the appellant under his father, the appellee, as the owner; but the preponderance of the evidence is clearly to the effect that such possession was originally taken as aforesaid in 1892 and subsequently held by appellant, certainly up to the year 1900, by permission of the father, the appellee, and in subservience to his title.

The only evidence on the subject of the next preceding paragraph consists in the depositions of the appellee and appellant. The appellee testifies that when the ap-

pellant came back to Charlottesville after his marriage in Washington, in 1892, the appellee gave the appellant, his son, "a job at the soap and chemical factory," and "asked him what he was going to do with his wife (that), he said he did not know, said he was staying with his mother-in-law * * and they did not want him." That appellee thereupon said to appellant, "I have a house here that's vacant and I will lend you some furniture and I will let you stay in the house on your good behavior." That appellee did supply all the furnishing for the house, except a stove given appellant by some one else, and that appellant then moved into the dwelling house upon the said lot, under the aforesaid gratuitous permission and subject to the aforesaid condition. That appellant by his dissipated habits soon forfeited all right to the use of said real estate, but the appellee, entirely gratuitously, allowed the appellant to continue, as a tenant by sufferance only, to occupy the property and to rent it out and receive the rents when not occupying it himself. That accordingly the appellant subsequently occupied and collected rents from the property through his agent, Mr. Allen, as a mere tenant by sufferance without any claim of ownership of the property whatever on the part of appellant, so far as appellee was ever informed in any way, until about twelve or eighteen months before the instant suit was brought, when there was some talk of the Methodist Church buying this property, and when, for the first time, appellee heard that appellant claimed title to it.

The appellee explains in his testimony that the aforesaid gift to his son of the privilege of using said property as a home and of collecting the rents from it were induced by the hope that the son would make it his home and after being away would return to it. Upon this point appellee testifies in part as follows: "I wanted the

place for him; a place that he could call home,    *    *
he wasn't desirable to have in the house with my sister,
his habits being such that they couldn't stand him."

The appellee further testifies that, after said tenancy
by sufferance began, the appellant "gave Mr. Allen the
proceeds out of the rent of the house for getting him out
of jail." That on one occasion during the tenancy by
sufferance, appellant got drunk at Orange and "shot a
man, was locked up in jail, threatened with being
mobbed, wired me (appellee), I went down and com-
promised and let him out, it cost me (appellee) $200.00."
And the testimony of and for the appellee, shows that
during the time Mr. Allen was renting out the property
as aforesaid, the appellee became dissatisfied at the use
by the appellant of the rents from the property in dis-
sipation and for the payment of lawyers fees incurred
because of such dissipation, and threatened to discon-
tinue allowing the appellee to receive the rents. That
appellee did not, however, as a matter of fact, ever at-
tempt to carry out this threat, but continued to allow
the appellant to retain the use and enjoyment of the
rents from the property, with full assent thereto, until
the appellee was informed of appellant's claim of title
to the property as aforesaid.

The appellant in his testimony does not controvert
the truth of any of the aforesaid testimony of his father
except that he says that immediately or shortly after
he moved upon the property in 1892 he claimed the
property as his own and told his father that it was his
property. He does not say how he claims to have ac-
quired the property. He admits that he had been in-
formed before he went upon the property that his father
owned it under the aforesaid deed from Vandegrift and
wife, but says that he knew that the deed was then un-
recorded, and bases his claim of ownership on the

ground that his father had no title to the property because his deed to it was unrecorded until 1913.   And the testimony of appellant is otherwise so self-contradictory that it bears on its face the appearance of being wholly unreliable where it is in conflict with that of his father.

As bearing on the question of what claim of title the appellant made to the property after his entry into possession of it in 1892; and on the actual or constructive notice to appellee of such claim prior to the time at which appellee testified, as aforesaid, that he was first informed that appellant claimed title to the property, with the exception of the testimony of the appellant and appellee, the following is the only evidence in the cause:

Mr. Allen testified that some time in 1900 or in 1902, prior to July 1, 1902, the appellee had an interview with him.   On this subject the material portion of Mr. Allen's deposition is as follows:

"   *   *   *   Mr. L. W. Cox, speaking as I thought with some feeling, said to me that Edgar was going to destruction; that instead of this property being a benefit to him it was a disadvantage, because he was using the proceeds for his dissipation, and said, 'I have made up my mind that I am going to take it away from him, and if you interfere in the matter, or try to help him about it, I am going to hold you responsible,' and I said to Mr. Cox—*I am giving the substance of this, of course; I don't pretend to repeat the language of that long ago*—and I said to Mr. Cox, 'Edgar claims that you haven't any right in the property.   It belongs to him, and so long as he wants me to handle it for him I expect to do so, and you can go ahead whenever you choose, and apply your remedy.'   I don't know what else was said. I think that is the substance of what was said at that time.

"10 Q. Then between the years 1900 and 1902, dur-

ing your encumbency as mayor, there was a conflict between Edgar N. Cox and his father, L. W. Cox, over the ownership of this property?

"A. There evidently was at that time.

"11 Q. Then I understand, Mr. Allen, that you have since that date held the uninterrupted use and possession of this property for the benefit of Edgar N. Cox, and no one else?

"A. Unquestionably so. Mr. L. W. Cox at intervals since the conversation has talked with me about the property, and made more or less protest about matters in connection with it, and I have on each occasion told him that in our view he had nothing to do with it and we would handle it to suit ourselves; and so far as my knowledge goes it has been handled absolutely regardless of any claim that Mr. L. W. Cox had in it." (Italics supplied.)

\*　　　　\*　　　　\*　　　　\*

"14 Q. Did you know at that time whether the controversy was over the title to the property, or over the proceeds to the property.

"A. As I understand it, it was over the possession of this property as well as the title. I always understood that L. W. Cox had gotten a deed for the property from Mr. Vandegrift, but at that time the deed was not on record. I think Mr. Cox has said since that Mr. Cox lost it, and found it later; but it was not on record at that time.

"3 Q. Did Mr. Edgar Cox ever explain to you what claim or title he had to this property?

"A. No. You mean as to how he came in possession of it?

"4 Q. Yes, sir.

"A. No, I don't know a thing about that part of it. I only know he had been in possession of the property

for quite a number of years before he came to me with it; but how he is holding I don't know anything about that.

"5 Q. Did Mr. L. W. Cox ever tell you how Edgar came in possession of it?

"A. I think perhaps in recent years—that is, within the last eight or ten years—Mr. L. W. Cox did perhaps tell me something about it. Do you want me to relate it?

"6 Q. Yes, I would like you to tell it. I don't want you to tell it word for word, of course; it has been such a long time.

"A. The thing's so vague, I may not be able to do anybody justice, because it is more or less a guess. My recollection is now that at two different times Mr. L. W. Cox told me that he had given Edgar the property when he was married, but had never made him any title to it, and was holding the title until he would see how he straightened up. *Now I am not saying that is true. That is my impression. That's all.* (Italics supplied).

"The other time was more recently, I think if I am not mistaken at that time Mr. Wesley said that he had let Edgar have the use of it, but never intended giving him the title, and never had given him title.

"I don't know whether either of those are accurate or not. That's my impression, that's all."

Mr. McPherson, a witness for appellee, who married a sister of appellant, a daughter of appellee, in 1912, testified in 1921 as follows:

"Q. Did you ever have a conversation with Mr. Edgar N. Cox about this property in dispute, as to how he came in possession of it; as to what claim he had to it?

"A. I have talked to him on several occasions in regard to this property. In other words, he talked to me. It was kind of forced conversation sometimes. And he

claimed the property, and it has been looked upon and spoken of as Edgar's property ever since I knew anything about it. *I reckon ten or twelve years.* The property that I owned over there on the south side of Main street—I had a big back porch out there, and this property was fronting, my back porch was where I could just sit out there and see this property, and any time that any of the girls, Mr. Cox's daughters, came there they would always speak about it as Edgar's property over there. (Italics supplied.)

*          *          *          *

"And they looked upon it and spoke of it, that Edgar had already received more than the balance of them; that he had been in possession of this property and he looked upon it as his property, and collected the rent; and he said paid the taxes; and I believe he said Mr. Allen was his agent, and looked after it for him.

*          *          *          *

"Q. Did you ever hear any conversation between Mr. L. W. Cox and Edgar N. Cox with reference to rents from this property?

"A. I don't know that I ever did. I don't recall any time that I ever heard them in conversation about it.

"Q. What claim did Edgar make to this property to you?

"A. He said his father gave him this property a number of years ago, and that by virtue of paying the taxes for a number of years that the property was his,* * *.

"Q. When did you first hear Edgar Cox, the plaintiff in this case, claim this property by reason of adverse possession?

"A. That's just about the time the Methodist Church wanted it. That's the first time I heard him make that claim. I believe it was last year, about twelve or eighteen months ago.

"Q. Prior to that time, I believe you stated he claimed it as a gift from his father?

"A. Yes, and by right of paying taxes on it.

## *"Cross Examination.*

"Q. When did you come to Charlottesville?

"A. I came eight years ago. Nine years ago this June.

"Q. When were you married?

"A. I was married in 1912.

"Q. Ever since you have been here, or were married, or became acquainted with your wife and her people, they have recognized this as Edgar Cox's property?

"A. Yes, sir; it was spoken of as such.

## *"Re-Direct Examination.*

"Q. Spoken of as having been given to Edgar by Mr. L. W. Cox?

"A. Yes, sir.

## *"Re-Cross Examination.*

"Q. You say the property was spoken of as having been given to Edgar. I thought you said your sister-in-law would go to the place, and refer to it as Edgar's property?

"A. They did; but Edgar would speak of how he came in possession of it. I don't know how that was—how he came in possession of it, or anything about that."

It appears from the testimony of appellee, and from other testimony in the cause, that what appellee had in mind at the time of his interview with Mr. Allen in 1900

or 1902, about which the latter testified as above stated, was merely the then partly formed purpose of appellee to discontinue letting his son, the appellant, receive the rents from the property in controversy, because of the dissipated habits of the son and the feeling on the part of the appellee that the property was a disadvantage rather than a benefit to the son, because he was using the rents "for his dissipation." In the mind of appellee on that occasion, the subject of the conversation involved simply a question of whether he would continue to allow his son, or Mr. Allen as his assignee, to continue to have the rents from the property. The appellee emphatically testifies that Mr. Allen never told him that his son, the appellant, was claiming title or was setting up an adverse claim to the property itself.

The material portion of the decree under review is as follows:

"* * * it is hereby adjudged, ordered and decreed that the legal and equitable title to the said land in controversy as between the parties hereto is in the said L. W. Cox, defendant, that said Edgar N. Cox, complainant, is not the owner of the legal or equitable title to the said land, that the said bill of complaint be dismissed, and the cause removed from the docket, and that the said complainant doth pay unto the said defendant his costs by him in this behalf expended."

*Perkins, Walker & Battle*, for the appellant.

*L. O. Haden* and *Walker & Walker*, for the appellee.

Sims, J., after making the foregoing statement, delivered the following opinion of the court:

[1] From the evidence in the case it is plain that the

possession of the appellant was originally taken and held in subserviency to or in privity with the title of the appellee.    This being true, it is well settled that the statute of limitations did not begin to run in favor of the appellant upon his claim of title to the property until the appellee had actual or constructive notice of such claim.    *Baber* v. *Baber*, 121 Va. 740, 758, 94 S. E. 209; *Creekmur* v. *Creekmur*, 75 Va. 430; *Reusens* v. *Lawson*, 91 Va. 226, 21 S. E. 347; *Thompson* v. *Camper*, 106 Va. 315, 55 S. E. 674; *Yellow Poplar Co.* v. *Thompson*, 108 Va. 623, 62 S. E. 358; and *Duggins* v. *Woodson*, 117 Va. 299, 84 S. E. 652.    .

The case, therefore, turns upon the answer to the following question:

1.  Did the appellee for any continuous period of fifteen years, have (a) actual, or (b) constructive notice that the appellant claimed title to the property in controversy?

The question must be answered in the negative.

[2] There is no evidence in the cause tending to show that appellee had actual notice of any adverse claim of title by appellant until about a year or eighteen months before the suit, except the testimony of the appellant and the testimony of Mr. Allen.

The testimony of the appellant bears on its face such *indicia* of unreliability, where it is in conflict with that of the appellee, that we do not regard it as furnishing any evidence which we can consider upon the question before us.

In Mr. Allen's testimony he says himself that he was giving merely the substance, as he remembered it, of what he said to the appellee, and of what appellee said to him in the interview in 1900 or 1902.   He says: "I don't pretend to repeat the language of that long ago." And Mr. Allen had not been informed at that time that

appellant held the property merely as a tenant of the appellee by sufferance. Mr. Allen then knew merely that appellant claimed to him that he owned the property. Whereas, appellee, knowing how the appellant obtained possession of the property, had no idea that the son claimed any title to the property itself, and regarded his conversation in 1900 or 1902 with Mr. Allen as being merely upon the question of whether the appellee would continue to allow his son, or Mr. Allen as his assignee, to continue to have the rents from the property. The same different attitudes of mind existed when the subsequent interviews occurred between appellee and Mr. Allen about which the latter testified. And as to what the appellee said, or what he himself said, in such interviews Mr. Allen is not positive. Such being the respective attitudes of their respective minds, and the failure of the evidence to disclose precisely what was said on the occasions involved, the failure of the appellee to understand, from what Mr. Allen may have said, that the appellant claimed title to the property itself, is most natural and highly probable; and the impression which Mr. Allen had when he testified that, by the language he used, he had conveyed to appellee the information that the son claimed title to the property itself, may easily have been a mistaken one, however, genuinely left upon the mind of Mr. Allen. Upon the whole, and especially in view of the positive testimony of the appellee to the effect that he did not so understand what Mr. Allen said to him, we are satisfied that the evidence fails to show that appellee derived from Mr. Allen actual notice that any hostile claim of title was made by appellant.

This leaves the appellant without any evidence in the cause of any actual notice to appellee of any adverse claim of title up until some twelve or eighteen months before the suit.

We come now to consider the second branch of the question before us, namely, whether the appellee had the constructive notice in question?

[3, 4] The law upon this subject is as follows:

Where, as in the instant case, the possession is originally taken under and in privity with the title of the true owner, it may subsequently become adverse without actual notice thereof to the latter, but only in the event that the possession is accompanied by an unequivocal, clear, positive, continued disclaimer of the owner's title, such as the owner could not mistake, for the whole of the statutory period, and so notorious that there is no other reasonable conclusion than that the owner, under the circumstances, must have had notice thereof. The disclaimer, to constitute such constructive notice, may be proved by circumstantial as well as by direct evidence, and it is not required to be proved so as to preclude all doubt; but that the possession is under claim of title hostile to that of the true owner, must, at the least, be generally known in the vicinity of the land involved for the whole of such period. *Baber* v. *Baber, supra* (121 Va. 740, 758-761, 94 S. E. 209); Sedgwick & Wait on Trial of Title to Land, secs. 280a, 281; *Caperton* v. *Gregory,* 11 Gratt. (52 Va.) 505; *Hulvey* v. *Hulvey,* 92 Va. 186, 23 S. E. 233; and also the cases above cited.

[5] There is no evidence in the case before us anywhere approaching the proof of such notorious disclaimer of title as would give the constructive notice in question so as to have set the statute running and to have kept it running for any period of fifteen years before the suit was instituted. According to the evidence the disclaimer of title so far back as fifteen years before the suit was made only to one person, Mr. Allen, the agent and assignee of the appellant, and privately made to him. There was no notoriety about that. There is

no evidence whatever that a single other person than Mr. Allen knew, as long as fifteen years before suit, that such disclaimer was made by appellee. And Mr. Allen's testimony cannot be regarded as showing that he conveyed to the appellee notice of an unequivocal disclaimer of appellee's title on the part of the appellant, such as the appellee could not mistake.

The only other disclaimer of the title of appellee by appellant is that embraced in his claim that the property was given to him by appellee and that appellant had obtained title by paying taxes, testified to by Mr. McPherson; but that first occurred within less than the statutory period requisite for the acquisition of title by adverse possession, as expressly stated by this witness, who alone testifies to any such claim of title as made by appellant. The same is true of the evidence furnished by the attitude and comments of the sisters of appellant, testified to by McPherson, with regard to the appellant's claim of title. There is no ·evidence of any such attitude or comments extending farther back at most than eleven years prior to the suit.

The decree under review must therefore be affirmed.

*Affirmed.*