# Wytheville.

## Austin v. Minor.

June 13, 1907.

Absent, Cardwell, J.

1. Quieting Title—*Jurisdiction in Equity and at Law—Case in Judgment.*—Courts of equity have jurisdiction to remove clouds from the title to land where the complainant has complete title and is in possession, but where the owner holds the legal title, without actual possession, and another, who has not actual possession, asserts an adverse claim to the land, the proper remedy is an action of ejectment, and equity has no jurisdiction. In the case in judgment, neither upon the issue of title nor of possession has a case been made out which justifies the interposition of a court of equity.

2. Quieting Title—*Evidence—Plat and Endorsements.*—In a suit to quiet title, although the deeds under which the complainant claims title do not in terms embrace the land in dispute nor bring the lands embraced within their boundaries into physical connection with the land in dispute, still an old plat with endorsements thereon, tending to show that the land in dispute is the land of complainant, is admissible in evidence as a circumstance to be considered in determinging the boundaries and title, but does not, in itself, constitute title.

3. Adverse Possession—*Marsh Lands—Case in Judgment.*—If the marsh lands in controversy in this case are capable of such enjoyment as, accompanied by a claim or color of title, would ripen into a good title, there has been no such use and occupation of them by any one as is necessary to constitute adverse possession, which must, to constitute good title, be open, notorious, exclusive, continuous and adverse.

4. Adverse Possession—*Lands Subject to Ebb and Flow of Tide.*—It is doubtful if title by adverse possession can be acquired of land over which the tide ebbs and flows, separate and distinct from the rights

of the riparian owner.  In the case of wild land, it is held that, in order to acquire title by adverse possession, there must be some change in their physical condition as a visible evidence of occupation and ownership, and it would seem that the same rule should apply to land under water, subject to the ebb and flow of the tide.

Appeal from a decree of the Circuit Court of the city of Williamsburg and James City county.  Decree for the complainant.  Defendant appeals.

*Reversed.*

The opinion states the case.

*William L. Royal* and *Geo. J. Hooper,* for the appellant.

*Armistead & Son* and *Samuel A. Anderson,* for the appellee.

KEITH, P., delivered the opinion of the Court.

Roselia A. Minor filed her bill in the Circuit Court of the city of Williamsburg and county of James City, in which she avers that she owns and occupies a certain tract of land in James City county, known as "Bush Neck" or "Sunken Ground," lying on Bush Neck Creek.  She deduces her title from John W. Minor, who by deed of the 16th of November, 1903, conveyed to her 189⅜ acres of land, 89⅜ acres of which is bounded as follows:  "On the north by the land of John W. Minor, and on the southeast by lands of John R. Austin, known as Indian Field, and on the west by Bush Neck Creek."  The remaining part (100 acres) of the above-mentioned piece of land, is bounded as follows:  "Commencing at a white oak on edge of marsh, thence a southwest course along edge of marsh to Bush Neck Creek, thence up creek a southeast course to a small gut on edge of marsh, known as Wolf's Gut, thence north through marsh a direct line to white oak on edge of marsh, the beginning."  She avers that her grantor had up to the date of the deed held and owned this land, which had been assessed

to him on the land books of the county; that he had paid taxes upon it from the year 1868 until the present time; and that "his ancestors have owned, held, used and enjoyed and paid taxes on the same certainly from about the year 1831 to 1868;" that said sunken ground or marsh is estimated to contain a little more than 100 acres, and is chiefly used for hunting and trapping. The bill then charges that J. R. Austin had procured the assignment of a part of a Land Office Treasury Warrant, and had unlawfully located the same upon plaintiff's land, and had fraudulently obtained a patent or grant from the State and caused the same to be recorded in James City county; that the plaintiff's land was not at the date of said unlawful entry either vacant, unappropriated, or liable to entry, as alleged by Austin; that she is greatly injured by what has been done; and that the grant from the Commonwealth constitutes a cloud upon her title. She prays, therefore, that J. R. Austin may be made a party defendant to the bill; that the grant or patent be declared void; and that the defendant and all others claiming under him may be restrained from disturbing the plaintifl in the full and quiet enjoyment of her land.

Austin answered this bill, denying plaintiff's title and claiming title in himself, and with respect to the land warrant states that he only took it out of abundant caution, and that his title to the land in controversy is complete without reference to the warrant. He prays that his answer may be treated as a cross-bill, and then goes on to set forth his title to the property in controversy and prays that he may be quieted in its title and enjoyment.

To this answer, treated as a cross-bill, the plaintiff filed what is styled a replication, but is in point of fact an answer and was so considered by the parties, who proceeded without objection to take evidence upon the issues of fact thus presented. The evidence is voluminous, covering a long period of time, and tending to prove use and enjoyment of the property upon the part of plaintiff and defendant, such as hunting, shooting, fish-

ing and trapping upon the disputed premises. Upon the proof the Circuit Court held that the grant from the Commonwealth to the defendant, J. R. Austin, was issued contrary to law and to the prejudice of plaintiff's rights, that it be annulled and declared void, so far as the land in dispute between the plaintiff and defendant is concerned; "and the court being also of opinion that said land called 'Sunkin Marsh,' bounded and described as containing one hundred acres in the deed from John W. Minor to the plaintiff dated 16th day of November, 1903, has been for many years, certainly ever since 1868, in the continued, uninterrupted possession of the plaintiff and those under whom she claims, claiming title thereto, asquiesced in by those under whom defendant claims the adjoining land known as 'Indian Field' and 'Clarks'; and the said 'Sunkin Marsh' is not appurtenant to said land of the defendant or included within the boundaries of the said tracts known as 'Clarks' and 'Indian Field,' doth adjudge, order and decree that said land called 'Sunkin Marsh' belongs to and is the property of the plaintiff, Roselia A. Minor under the last mentioned deed." From this decree an appeal was taken to this court.

"The jurisdiction of courts of equity to remove clouds from title, where the party complaining has no adequate remedy at law, is well settled. This is particularly the case where he is the owner of the legal title, and is in possession of the land upon the title to which the cloud rests." *Va. Coal & Iron Co.* v. *Kelly,* 93 Va. 332, 24 S. E. 1020.

The jurisdiction of a court of equity to remove clouds from title was the subject of consideration in *Carroll* v. *Brown,* 28 Gratt. 791, and in *Stearns* v. *Harman,* 80 Va. 48, where it is said that on the principle of *quia timet,* a court of equity will entertain a suit by the owner in possession of land, to remove a cloud from his title, by annulling a deed that, by mistake or fraud, conveys the land to another, who makes adverse claim thereto, but brings no suit; but that the proper remedy is by

an action of ejectment where the owner holds the legal title but has not actual possession, and another asserts an adverse claim to the land, but has not actual possession of it. In such case equity has no jurisdiction. Citing *Harvey* v. *Tyler,* 2 Wall. 328.

In *Otey* v. *Stuart,* 91 Va. 714, 22 S. E. 513, Judge Buchanan delivering the opinion of the court said: "The allegations and prayer of the bill show that it is a bill filed for the purpose of removing a cloud upon the title to the land in question. As a bill to remove a cloud from their title it is also fatally defective. A court of equity, as a general rule, in the absence of statutory authority, does not entertain a bill of this character if the party filing it claims to be the owner of the legal title, unless he is in possession of the land upon which the cloud rests. The jurisdiction exercised by courts of equity in this class of cases, is founded upon the theory that the party making it has no adequate remedy at law for the injury of which he complains. If he is out of possession, and is the owner of the legal title, he has ordinarily a complete remedy at law by an action of ejectment."

Let us first consider appellee's title. J. W. Minor, by his deed of the 16th of November, 1903, before referred to, conveyed to Roselia A. Minor 189⅜ acres, which embraced the 100 acres in controversy. J. W. Minor, her grantor, claims under two deeds—one from Geo. W. Minor to Jno. W. Minor, dated September 21, 1888, conveying 150 acres, more or less, "being a portion of the tract on which the said George W. Minor now resides, and known generally by the name of Bush Neck and bounded as follows: "Commencing at a red oak near the stone landing, northeast course across the field to a sweet gum standing on an old ditch; thence E. course to a willow on the hill, thence same course to a white oak a corner line where it joins the tract of land called Indian Field, thence northeast to a pine tree near Bush Neck Road where it joins the land

on which Ned Wallis now resides, thence W. West course to a pine tree standing on the edge of Buzzard Island Marsh, thence same course down said marsh to Buzzard Island Bay, thence down said bay to Chickahominy River, thence South W. course down the said river to the mouth of Bush Neck Creek, thence up the said creek to the stone landing, the point first started from." And by deed from R. L. Henley, a special commissioner appointed by the decree of the Circuit Court of the County of James City and city of Williamsburg on the 11th day of November, 1887, in the consolidated chancery suits of *Hankins & Taylor, trustees, v. Minor, &c.,* and *Same v. Garrett, &c.,* and *Davis v. Minor,* conveying to John W. Minor "that certain tract of land called 'Bush Neck' containing by estimation 189¾ acres, bounded on the north by the lands of John W. Minor, west by Bush Neck Creek, south by 'Indian Field.' "

Austin's title, as shown by the deeds which he files, is also derived in part from Geo. W. Minor, who on the 24th of September, 1868, conveyed to Melchisidec Spraggins a parcel of land containing 129½ acres, "being the same tract of land on which John Nettles now resides, and bounded as follows: Commencing at a point of marsh on Bush Neck Creek and near the landing on Utopia Island and running N. E. course along a line of marked trees to a gum near the land on which Ned Wallace now resides, thence S. E. to a cedar standing in a valley near the Sunkin Marsh, thence down said marsh S. W. course to Bush Neck Creek, thence down the said creek to the point of marsh first started from." Spraggins conveyed this tract to John Nettles by deed of September 1, 1871. On the 19th of November, 1870, Freeman and wife conveyed to John Nettles all their title and interest, being one-half of 129½ acres which Thomas T. Clarke, the father of Elizabeth M. Freeman, purchased of William Durfey, situate in Bushes Neck, James City County, Virginia, adjoining the land of John Nettles and others. On the 29th of April, 1871, John W. Clarke and wife conveyed to John Nettles what seems to

be the other undivided moiety of this 129½ acre tract of land.
John Nettles, by his will dated the 20th of February, 1899,
devised all his estate, real and personal, to his daughter, Harriet
A. Rogers, subject to the dower right of his wife, Virginia
Nettles; and on the 21st of July, 1900, Harriet A. Rogers and
her husband conveyed to Sands Gayle, "that certain tract, piece
or parcel of land containing one hundred and twenty-nine and
one-half (129½) acres, located in Powhatan District, James
City County, Virginia, and bounded on the northwest by the
Main Road, on the northeast by the Canady tract of land, on
the southeast by Gordon's Creek and Sunkin Marsh, and the
southwest by the Indian Field tract, being the tract of land
formerly known as the Clark tract, which was willed to the
said Harriet A. Rogers by her father, the late John Nettles
. . ." And by deed of the 23rd of October, 1900, Harriet
A. Rogers and her husband, and Virginia Nettles, the widow
of John Nettles, conveyed "All that certain piece or parcel of
land with the appurtenances and privileges thereto belonging,
located in James City county, Va., containing about 129½
acres, being known as 'Indian Field,' and described in a cer-
tain deed from G. W. Minor to Melchisidec Spraggins dated
the 24th day of Sept., 1868, as commencing at a point of marsh
on Bush Neck Creek and near the landing on Utopia Island
and running N. E. course along a line of marked trees to a
gum near the land on which Ned Wallace now resides, thence
S. E. to a cedar standing in a valley near Sunkin Marsh, thence
down said valley until it strikes Sunkin Marsh, thence down
said marsh S. W. course to Bush Neck Creek, thence down said
creek to a point of marsh first started from, which deed is re-
corded in the clerk's office of the County Court of James City
Co., in Deed Book Vol. 2, page 190—which land was conveyed
to John Nettles by deed from Spraggins recorded in said clerk's
office in Deed Book 2, Vol. 424, and willed by said John
Nettles to said Harriet A. Rogers, by will recorded said clerk's
office in Will Book Vol. 2, page 42—to which deeds reference

is herein made for the purpose of more clearly indicating the land hereby conveyed, the same being sold gross as a farm, and not by the acre."

It seems then that appellee claims under John W. Minor, and that he did, by his deed of the 16th of November, 1903, attempt to convey the 100 acres of land now in dispute, but the deeds under which he held title do not in their terms embrace that land, nor do they bring the land embraced within their boundaries into any physical connection or touch with the land in dispute.  On the contrary, reading the courses and distances in connection with the plat and surveys filed in the record, it appears that the land known as "Indian Field" and the "Clark" tracts, title to each of which is in J. R. Austin, are interposed between the lands of J. W. Minor and the Sunkin Marsh.  An attempt is made to meet this difficulty by reference to an old plat which purports to have been made in 1831, upon which there is this memorandum:  "This line cuts all the marsh from the high land of Mr. Warburton by agreement of W. & M., except about 20 acres annexed to Rye Patch tract;" and a further memorandum to this effect:  "This plot including the marsh contains five hundred and seven acres and a half, being the half of Bush Neck tract purchased by Warburton & Minor, and such plot is for the benefit of John Minor."  That plat with the memoranda upon it is a circumstance to be considered in the determination of boundaries and title, but does not in itself constitute title.

When we come to consider appellant's claim of title it appears that he is the owner of land which is contiguous to the marsh in controversy, and his claim is that the marsh belongs to him as appurtenant to his riparian rights.

There is in the testimony of one witness a statement from which it may be inferred that the tide ebbs and flows over this marsh.  J. F. Martin was asked: "Did you trap anywhere near he was trapping?  A. I trapped out there as far as I could walk, or land with a boat when the tide was low.  Q. Now

is it not a fact that in trapping the traps are set when the tide is low and the musk rats and other game taken out when the tide is high? A. It depends on what sort of marsh you are trapping on." This is the only direct statement to be found in the record as to the ebb and flow of the tide. It does not give the high water mark or the low water mark, nor the relation of the land in dispute to high and low water mark, and is therefore insufficient to enable the court to say what are the riparian rights of appellant, if any such there be. It is plain from the evidence that the disputed property is a marsh, but is it a marsh, over the whole of which the tide ebbs and flows? Does it ebb and flow up to the boundary of appellant? These are questions to which the proof does not enable us to give a certain and definite answer.

When we come to consider the question of possession, it appears that the property in dispute was valuable only for hunting, fishing and trapping, and to a limited extent as a range for hogs. A great many people seem to have hunted, fished and trapped upon it. Those under whom appellee claims, it may be conceded, used and enjoyed it in all those respects in which it could be used and enjoyed far more than any one else; but it was also hunted over, used and enjoyed by appellant and others than the appellee. There was no such use and occupation of it by any one as is necessary to constitute adversary possession, which must be open, notorious, exclusive, continuous and adverse.

Is the property in question capable of such enjoyment as accompanied by a claim or color of title would ultimately ripen into a good title? If the tide ebbs and flows over this property, it is doubtful whether a title by adverse possession can be acquired to it, separate and distinct from the rights of the riparian owner. *Rowe* v. *Strong,* 107 N. Y. 350, 14 N. E. 294.

In *Taylor* v. *Burnsides,* 1 Gratt. 202, it is said that "wild and uncultivated lands cannot be made the subjects of adversary possession, while they remain completely in a state of

nature.   A change in their condition, to some extent, is there-
fore essential; and the acts by which it is effected are often
the strongest evidence of actual possession.   Without such
change, accomplished or in progress, there can be no residence,
cultivation or improvement; no occupation, use or enjoyment.
Evidence short of this may prove an adversary claim; but, in
the nature of things, cannot establish an adversary possession.
Nor is there any reason for relaxing the rules of law on this
subject in behalf of the adversary claimant on such property.
There ought to be no presumption in his favor against the
better title.  It is in vain for him to say that he has had all the
possession of which the property was then susceptible; for that
would lead to a constructive possession, which is only attribu-
table to the rightful owner."

In *Harman* v. *Ratliff,* 93 Va. 249, 253, 24 S. E. 1023, it is
said:   "While lands remain uncleared, or in a state of nature,
they are not susceptible of adverse possession against the older
patentee, unless by acts of ownership effecting a change in their
condition, and to constitute adverse possession there must be
occupancy, cultivation, improvement or other open, notorious,
and habitual acts of ownership."

Those cases are, of course, not direct authority for the point
under consideration, but the principle which controls them
would seem to apply with much force to the case under
consideration.

In *Taylor* v. *Burnsides* and in *Harman* v. *Ratliff* it was held
that in order to acquire title by adverse possession to wild
lands there must be some change in their physical condition
as a visible evidence of occupation and ownership.   The argu-
ment upon which the conclusion rests would seem to apply with
equal if not greater force to land under water, subject to the
ebb and flow of the tide, upon which it is difficult if not impos-
sible to erect any visible and permanent evidence of occupation.

We are of opinion that neither upon the issue of title nor
of possession has a case been made out, either by appellant or

appellee, which justifies the interposition of a court of equity to take jurisdiction over the subject in order to remove the cloud upon the title, but that the parties should have been left to proceed at law to establish their rights, where the whole subject can be inquired into and determined by a jury.

We are of opinion that the decree of the Circuit Court should be reversed, and the bill of plaintiff in the court below and the cross-bill be dismissed with costs to the appellant.

*Reversed.*