# Richmond

## Sue S. Leake, Et Al. v. Fannie Richardson, Et Al.

April 28, 1958.

Record No. 4776.

Present, Hudgins, C. J., Eggleston, Spratley, Buchanan, Whittle and Snead, JJ.

The opinion states the case.

*R. Harvey Chappell, Jr. (Christian, Barton, Parker & Boyd; Norris, Richardson, Foster & Clarke,* on brief), for the appellants.

*C. Jackson Simmons* and *W. B. McLeod (Dunton, McLeod & Simmons,* on brief), for the appellees.

SPRATLEY, J., delivered the opinion of the court.

The bill in this cause filed by Sue S. Leake, H. Godwin Jones, Homer S. Wilson, Jr., and W. M. Bridgeforth, against Fannie Richardson and J. L. Bromley, prayed for a declaratory judgment declaring Sue S. Leake the absolute and exclusive owner of Ball's Mill Pond in Lancaster County and the water and fishing rights therein; that an injunction be awarded against the defendants restraining them from going upon, keeping boats on, or fishing in the waters of the said pond; and for damages for trespass and removal of fish therein. Mrs. Richardson and Bromley answered and denied the contention of the complainants.

By leave of Court, Warner Ball, James Ball, Mary Ball Snead, Eoline Ball Jesse, Thomas F. Ball, Sr., Louise Ball Hamilton, William J. Dann, Jr., Flementine P. Dann, and Albert E. Dann, II, were allowed to intervene as defendants. They filed answers denying the claims of the complainants, and cross-bills asserting claim of fee simple title to the center of the said mill pond adjacent to their respective lands. Complainants answered the cross-bills denying the claims therein asserted.

The trial court heard the evidence *ore tenus* and, for reasons stated in a written opinion, held that complainants had not established ownership of the water and submerged land of the pond either by record title, adverse possession, or prescription. It decreed that the defendant landowners and Sue S. Leake were, respectively, the fee simple owners of the submerged land and waters of Ball's Mill Pond, which lie adjacent to their respective tracts of land bordering said pond and extending between their side lines to the approximate center thereof. The complainants appealed.

Ball's Mill Pond is located in Lancaster County, and comprises an area of approximately 19½ acres. The pond, irregular in shape, extends north and south with an arm to the east, and is fed by several fresh water streams, notably from the east and the north. It is entirely surrounded by dense woods and weeds. It is not known wheth-

er the mill dam, which is located near the southwestern end of the pond, was formed naturally or by artificial means. Prior to 1929, a water grist mill was operated at the dam. The only building near the edge of the pond is a cabin, used as a club house from time to time, on the land of the complainant, Leake. A road runs from the public highway to that land. It appears that formerly the public road passed over the dam; but about 1926, it was abandoned and a new and improved public road was built which now passes through the land of Leake and on a bridge across the stream flowing from the pond, west of the abandoned road. There is some evidence that roads lead to one or two parcels of land of other landowners adjoining the pond but do not extend to the waters.

The only questions presented on appeal are whether Sue S. Leake and her predecessors in title acquired Ball's Mill Pond by adverse possession, and whether she and her predecessors in title acquired exclusive fishing rights in the said pond by prescription. Complainants have abandoned any claims to a record title in Mrs. Leake or her predecessors and to damages against defendants.

By deed dated May 15, 1929, H. D. Eichelberger conveyed the following described property to David H. Leake:

"* * * (A)ll that certain parcel of land, situated in White Chapel District, Lancaster County, Virginia, adjoining the lands of Joseph Peirce (Known as 'Ball's Quarter') and others, together with all improvements thereon and appurtenances thereto belonging, also all machinery, fixtures and personal effects contained in the mill, said parcel of land bounded and described as follows: Beginning at A, a red oak, marked on the edge of the mill pond, and running S-84-W. 13 chains to B, a cedar stob, thence S-10½-E. 7.75 chains to b, edge of Mill stream, thence N-52-E. 14.58 chains to the beginning, and containing five acres more or less, upon which is situated the water grist mill known as 'Ball's Mill'; *together with the unqualified and absolute right to maintain and have the dam and pond adjoining the above described tract of land, to the exclusive use and benefit of the party of the second part, his heirs and assigns forever.*" (Emphasis added.)

On July 26, 1956, after the death of Leake, the land and pond described above were conveyed by his executors to his widow, Sue S. Leake.

Mrs. Leake, by writing dated September 14, 1956, renewed and extended the right formerly granted by her husband to the com-

plainants, Wilson, Bridgeforth and Jones, to use Ball's Mill Pond cabin and premises, with their families and invitees to the exclusion of all others.

The same general description of the five acres in the deed to Leake is found in the following deeds in his chain of title: Deed of February 10, 1927, from Paul L. Ruehrmund and wife to Harry D. Eichelberger; deed of May 4, 1925, from J. M. Dozier and wife to Paul L. Ruehrmund; deed of December 26, 1923, from Paul L. Ruehrmund and wife to J. M. Dozier; and deed of December 14, 1923, from L. T. Rock to Paul L. Ruehrmund, in which the emphasized portion of the description in the deed from Eichelberger to Leake first appears.

The next link in the chain of title is a deed dated August 14, 1902, from Alex Stronach, *et al.*, to L. T. Rock. In it appears, in lieu of the emphasized portion of the deed from Eichelberger to Leake, the following language:

"And the said parties of the first part hereby agree that the party of the second part shall have the right, so far as they can grant it, to raise the dam of the said mill known as Ball's Mill Pond not more than two (2) feet."

The chain of title of the defendants, William J. Dann, Jr., Flementine P. Dann, and Albert E. Dann, II, to 1223 acres of land was traced to a deed dated August 14, 1902. In the several deeds, the land was described as bounded "on the south by Ball's Mill Pond" or by "Ball's Mill Pond and Mill Stream."

Warner Ball, James Ball, Mary Ball Snead, Eoline Ball Jesse, Thomas F. Ball, Sr., and Louise Ball Hamilton inherited from their father, W. Ball, 59 acres, more or less, on the south side of the pond described in a deed dated June 13, 1895, from Elizabeth J. Kemm to W. Ball, as follows:

"* * * known as Kemms, * * * and more particularly described as follows: bounded on the North and West by Ball's Mill Pond * * *."

By deed dated April 1, 1926, Fannie Richardson, daughter of Susan B. Rock, acquired from her brothers and sister their three-fourths interest in 121 acres described as bounded on the north by Ball's Mill Pond, which the four children inherited from their mother. Mrs. Susan B. Rock acquired the property by deed dated May 18, 1881.

It was stipulated that the title of each of the defendant landowners was not in issue, and that in the deeds in their respective chains of title their lands were described as bordering on Ball's Mill Pond as far as the records of the County of Lancaster exist.

The defendant, J. L. Bromley, owns no property adjoining Ball's Mill Pond.

George W. Clark, the first witness introduced by the complainants, testified that he had lived on the 5½ acres of the Leake tract about two months before it was sold to Leake; that Eichelberger, the former owner, had let him have the tenant house and garden on the premises free of rent under an agreement that he, Clark, would "see after the pond and keep anybody from fishing in it," without permission from Eichelberger; and that he stayed there about eight years and never had any trouble with anybody trying to fish without permission.

After acquiring the property, Leake continued the employment of Clark as caretaker upon the same terms. Clark said that during this period of employment, no one except Leake kept boats on the pond; that he never walked around it because of the density of the woods; and he knew of no roads or trails to the waters of the pond other than the one on the Leake property. Clark was employed by the State Highway Department, went to work at half-past six in the morning and returned after five p. m. While he was away, his wife and infant son were the only ones on the premises. It was possible to see only the front portion of the pond from the house where he lived; no one could see the surface of the branches of the pond; and there was no one to stop people from fishing on such waters during the day. He never noticed people fishing from the shores, and never used the pond for himself, except, perhaps, six times during the eight years he was caretaker and had never forbidden anyone to fish there.

In the early summer of 1936, Clark moved from the premises and a month or so later, he was succeeded by W. J. Barton as tenant and caretaker. Barton stayed on the premises until 1951, rent free, under the same directions given Clark. He went around the pond frequently, but never saw any evidence of persons engaged in fishing on the pond or from its shores. On one or two occasions, he had observed people fishing from the dam and chased them away. He said there were no boats on the pond except those belonging to Leake and the latter's friends; and that there was no practical way to get a boat to the pond other than proceeding along the public highway near Leake's property. He could not see the entire pond from his house. He worked as a day laborer for other people at different jobs, painting, lumbering, and highway work, a part of the time at a place distant from the County of Lancaster. He left the premises between 5:30 and 6:00 a. m., and returned about 6:00 p. m.,

working five or six days each week. His wife looked after the pond when he was away from the house and she had no trouble. Leake told him it was a private pond, but he didn't say that it was his pond. While he was on the premises, he never saw any of the defendants fish in the pond, not even Bromley, who had a permit from Leake.

Barton further said that, as a boy, he used to fish and swim in the pond without requesting permission of any one, and never, during his boyhood days, heard that any one was excluded from the free use of the pond; that some colored people and a man who ran the mill had a boat in there; and that in years past people used to bring their corn in boats across the pond to the grist mill then in operation.

David H. Leake, a resident of the City of Richmond, Virginia, was an attorney at law and counsel for the C. & O. Railroad. Beginning in 1929, he hunted on the land and fished in the pond, and at such times he occupied the cabin near the old mill site. He gave his relatives and friends written permission to fish also, and in 1952, granted the right of user of the pond, cabin, and premises to the complainants, Wilson, Bridgeforth and Jones.

Dr. Franklin A. Tyler testified that he fished in the pond one time with Eichelberger, his long time friend, while the latter owned the five acres of land involved; that he obtained a fishing permit from Eichelberger which he used frequently until Leake acquired the property; that Eichelberger told him that no one was allowed to fish without his permission; and that he did not visit the pond after it was acquired by David Leake.

H. D. Eichelberger, Jr., said his father claimed the exclusive ownership of the pond and fishing rights.

Andrew K. Leake, nephew of David Leake, said his uncle required persons fishing in the pond to obtain permission from him.

George W. Johnson, who owns land at the "lower side of the dam," testified that he never fished in the pond, although he had a permit from Leake to do so. He lived about a mile from the pond, had never heard any question raised as to Leake's ownership until after Leake's death, and had never seen any boats thereon other than those of Leake or his friends. On cross-examination, Johnson said he never talked to any other landowners adjoining the pond; and had no knowledge of conditions thereon. He further said that he did not desire to give Leake any trouble because it didn't mean that much to him.

It further appears that through the efforts of H. D. Eichelberger

and his friend, Dr. Franklin A. Tyler, the pond was stocked with silver perch during the former's ownership. Leake maintained the mill dam from 1929 until his death, as did Eichelberger before that. Wilson, Bridgeforth and Jones had the dam spill-way repaired to prevent the water from running out of the pond. There is no evidence that any of the defendants ever maintained the dam or contributed to its maintenance.

Henry H. Pittman, Jr., State Game Warden, for the past nine years and eight months, said that he had made two arrests of persons for fishing in the pond without license; but that he had a grave doubt as to whether it was a private pond, and, therefore, whether he had a right to issue licenses for fishing in the pond.

The complainant, Jones, said that he fished on the pond from the year 1944, obtaining permission from David Leake; and that Leake required all persons using the pond to have a permit.

In 1954, J. L. Bromley, who already had written permission from Leake to fish on the pond, also obtained written permissions from Fannie Richardson and Louise Ball Hamilton. When Leake heard of this, he advised Mrs. Richardson by letter dated April 2, 1954, of his claim to complete ownership of the pond, with exclusive right to fish therein, and that he regarded persons using the pond without his permission as trespassers. Mrs. Richardson replied, stating that the pond was the boundary of her land; but she made no claim to any of it. She explained that she had granted the permission to Bromley to fish at the latter's request. Mrs. Richardson did not appear at the trial because of age and ill health; but in her answer in the cause, she fully denied the claims asserted by Leake.

Bromley, on April 6, 1954, wrote Leake that he had been advised by the Commonwealth Attorney for Lancaster County, that Ball's Mill Pond was not a private pond, and following receipt of that letter, Leake revoked Bromley's permit to fish in the pond.

J. L. Bromley is a merchant, living about a mile from the pond. He said he had always questioned Leake's claim to the pond; that Leake had never told him that he owned the pond; and that in the only conversation they had ever had Leake stated that he thought he controlled the pond but "didn't want to carry anybody to Court." Bromley said he had fished in the pond about fifty years ago as a child, and not afterwards until the lapse of right many years. He obtained a permit from Leake in 1952, or 1953.

E. Garnett Mercer, Jr., Commonwealth Attorney of Lancaster

County, said that he looked up the title of Mrs. Richardson, and advised Bromley that where a person owns land on a non-navigable stream, he owns to the center of the stream. He did not consider the question of adverse possession.

T. D. Wilkinson, III, surveyor, presented and explained several maps of the property introduced in evidence.

The evidence shows that the grist mill, having fallen into decay, had been abandoned many years ago, and the pond has been since used for fishing or hunting purposes only. The Leake property, although it fronts on the pond for less than 300 feet, a very small percentage of the entire waterfront of the surrounding landowners, is the most desirable site for such purposes.

None of the defendants, Warner Ball, James Ball, Mary Ball Snead, Eoline Ball Jesse, Thomas F. Ball, Sr., and Louise Ball Hamilton, had actual knowledge that Mrs. Leake or her predecessors in title claimed the ownership of the entire pond until the summer of 1956.

Mrs. Eoline Jesse, who lives approximately two and one-half miles from the pond, said she had given permission through the years to her friends to fish therein; that she was fond of crabbing but not of fishing, and, therefore, never fished in the pond. All the rest of her family lived outside of Lancaster County. During the life of her father, Warner Ball, an attorney, she had copied legal documents for him, and she understood from him that the center of a stream or pond was the dividing line of land adjoining the pond, and she had always claimed to the center of Ball's Mill Pond.

James D. Jesse, Jr., who lived at the house of his mother, Mrs. Eoline Jesse, said he fished in the pond from 1930 to 1939. He always went to it from a road to the land opposite the land of Leake, and fished from the property belonging, in part, to his mother. He did not know Leake, but did know Barton and Clark, and had never asked permission from them or any one else to fish in the pond.

Mrs. Hamilton said she left Lancaster County in 1914, and is now living in Fredericksburg. She said her father, Warner Ball, had told her that he had acquired the property and that his deed "called to the center of the pond." She said she had intended for four or five years to build a cottage on the pond; but she never fished on it because she preferred fishing in the Rappahannock River. She gave Bromley several permits to fish before she knew that there was any controversy with respect to the ownership of the pond, and that in

the permits it was provided that they would not interfere with her possible future sale of the property.

Thomas F. Ball, Sr., lives about eighteen miles from the pond. He knew that his father, Warner Ball, owned 59 acres of land on the pond, and claimed to its center. He said that he, Thomas F. Ball, Sr., had gone to the pond through a back road on the land on the eastern side of the pond; and that he preferred fishing in salt water, but would not have hesitated to fish in the pond if he had so desired.

William J. Dann, Jr., lives in New York City, but has visited Lancaster County for short intervals during the last twenty years. He knew that Leake owned about five acres, being all of the land of the Stronachs that was not sold to others. He said that shortly after he purchased the property in 1939, he heard that several persons were making claim to the control or ownership of the pond as a whole; that he investigated these claims by going to the clerk's office and making a copy of the deed describing the five-acre tract; that he didn't go over all of the surrounding land because he didn't know where the lines were; that he had thought about repairs to the dam and spill-ways but had done nothing about them; and that he had no knowledge of any adverse claim being made to the pond by Leake, or any of his predecessors in title, until he received a letter to that effect from J. L. Bromley within the last few years. The only fishing he had done in the past twenty years was in a mountain stream in Montana or in the ocean, because he was not interested in mill pond fishing.

E. F. Dobyns, Commissioner of Revenue, for the last sixteen years, and Deputy for twenty prior years, said that Mrs. Leake and her predecessors in title had never paid taxes on more than five acres of land in the County; that in the last general reassessment in 1955, a notation was made that there was a riparian right connected with the five acres. No part of the submerged land was included for taxation. He further said that it was his "impression" that the bottom of the pond was assessed as real estate in connection with the lands of the adjoining landowners.

Charles B. Dodson, a resident of Lancaster County, said he used to visit the pond with Paul L. Ruehrmund on week-ends and holidays while the latter owned it; that Ruehrmund told him a dozen times or more that it was a public pond and not a private pond; that he was going to take a loss and sell it; and that subsequently Ruehrmund did sell Ball's Mill Pond and bought another pond in the County

with all the land around it. The record shows that Ruehrmund bought Ball's Mill Pond on May 4, 1925, from J. M. Dozier and re-sold it on February 10, 1927, to H. D. Eichelberger.

Leo Cooper had been a resident of Lancaster County since 1920, and was familiar with Ball's Mill Pond. In 1926, he fished in that pond with his brother and Hugo Dillon, using his own boat. He obtained permission from Mrs. Eoline Jesse. He did not have any contact with Clark or Barton, and did not know Eichelberger, Ruehrmund, or Leake.

The character of the acts necessary to vest one with a title by adverse possession varies with the nature of the property involved, the conditions surrounding it, and the use to which the property may be adapted. Where the land is uncleared, or in a state of nature, or where it consists of a fresh water pond or stream surrounded by lands of different persons, whose title as riparian owners include the land under the water to the center of such pond or stream, the acts of ownership must indicate a change of condition, showing a notorious claim of title, accompanied by the essential elements of adverse possession. *Harman v. Ratliff*, 93 Va. 249, 24 S. E. 1023; *Providence Forge Fishing and Hunting Club v. Miller Mfg. Co., Inc., et al.*, 117 Va. 129, 83 S. E. 1047; *Improved Realty Corp. v. Sowers*, 195 Va. 317, 78 S. E. 2d 588.

To work a disseisin or ouster of the owner of land, it is not sufficient to set up a mere claim or color of title. The acts relied on must show actual, hostile, exclusive and continuous possession for the period of the statutory bar; acts of such notoriety that the true owner has actual knowledge, or may be presumed to know, of the adverse claim. 1 M. J., Adverse Possession, page 223 *et seq.*, and cases cited.

The evidence here is not greatly in conflict except as to the user of the pond. Obviously, the character of the user being a question of fact, the burden of showing the essential elements of adverse possession is upon the person asserting such ownership. The trial court having found in favor of the defendants, we must, upon review, consider the case in the light of the evidence most favorable to them.

The facts in this case are very much like those in *Providence Forge Fishing and Hunting Club v. Miller Mfg. Co., Inc., et al., supra,* and *Improved Realty Corp. v. Sowers, supra.* The principles there applied are equally applicable here.

In the first named case, the claimant of adverse possession had no record title nor color of title. The acts of ownership relied upon were fishing and hunting, chiefly by its predecessors in title who instructed their agents not to permit others to boat or fish on the pond without their permission. It appeared that the defendants, adjoining landowners, also used the pond for boating and fishing when they desired to do so.

The second named case was instituted for the specific performance of a contract for the sale of a pond; but the controlling question was whether or not the complainant, the vendor, owned exclusive fishing rights in the pond. There, the vendor presented evidence showing that from 1929, when his father purchased land adjoining the pond, some member of his family stayed on it during the summer; that all of his family went to the pond every week-end, weather permitting; that his father, upon purchasing the land, began to assert exclusive right to fish in the pond and to control it; that signs were posted on tree laps and posts in the pond reading: "Private Pond—No Fishing;" that there never had been a dispute or contest over his exclusive right to use the pond; that no one outside of his family was allowed to have a boat or to fish from its banks; and that any other people who came to fish were run away; and that Sowers, the vendor, acquired the property in 1943, and thereupon took complete control and lived on it until he died in 1951, and, for five years prior thereto, rented fishing rights to people from Richmond and other places.

In the *Providence Forge Fishing and Hunting Club* case, *supra*, Judge Harrison said:

"Authority of the highest character is abundant 'that an adjoining landowner on an island fresh water lake or pond takes to the center: the same rules applying in such cases as apply in cases of streams." 117 Va. at page 131.

In *Improved Realty Corp.* v. *Sowers, supra,* we approved and reaffirmed the principles stated in the above case. After declaring that an adjoining landowner on an island or fresh water pond takes to the center thereof, and that in order to establish the exclusive right of fishing by prescription, Mr. Justice Buchanan quoted with approval the following statement from 14 M. J., Prescription, § 7, page 563:

"To acquire a right by prescription the use and enjoyment of what is claimed must have been adverse, under a claim of right, exclusive, continuous, uninterrupted and with the knowledge and acquiescence

of the owner of the estate in, over or out of which the easement pre-scribed for is claimed." 195 Va. at page 322.

The waters of Ball's Mill Pond were chiefly valuable during the last thirty years for fishing and hunting; the acts of the complainant, Leake and his predecessors in title were not inconsistent with the rights of the defendants, who used the pond for boating and fishing when they were able and desired to do so, and granted permits to others to do the same. There was no change in the condition of the pond which affected the rights of the defendants. There was no actual possession of the waters of the pond in the nature of things. It is not sufficient to say that the complainants had all the possession of which the property was susceptible, and there ought to be no presumption in their favor against the better title. *Austin* v. *Minor*, 107 Va. 101, 110, 57 S. E. 609. The situation here resembles the case of wild lands and the right asserted by Leake was not necessarily anything more than the assertion of a right held in common.

In the case of *Craig-Giles I. Co.* v. *Wickline*, 126 Va. 223, at 233-4, 101 S. E. 225, at 229, Judge Kelly said:

"In *Taylor* v. *Burnsides*, 1 Gratt. (42 Va.) 165, it was held that to sustain the defense of adverse possession the defendants, or those under whom they claim, must have entered upon the land in con-troversy and taken possession thereof by residence, improvement, cultivation or other open, notorious and habitual acts of ownership. Judge Baldwin, delivering the opinion in that case, said: 'It follows from what has been said that wild and uncultivated lands cannot be made the subject of adversary possession while they remain com-pletely in a state of nature. A change in their condition to some ex-tent is therefore essential; and the acts by which it is effected are often the strongest evidence of actual possession. Without such change accomplished or in progress there can be no residence, cul-tivation or improvement; no use or enjoyment. Evidence short of this may prove an adversary claim; but in the nature of things cannot establish an adversary possession. Nor is there any reason for re-laxing the rules of law on this subject in behalf of the adversary claimant of such property. There is to be no presumption in his favor against the better title. It is vain for him to say that he has had all the possession of which the property was then susceptible; for that would lead to a constructive possession which is only attributable to the rightful owner.' "

The existence of color of title does not dispense with the necessity

for acts of adverse possession. It is merely evidence tending to support complainants' claim when accompanied by the essential elements of adverse possession. Nor did the recordation of the deeds subsequent to the acquisition of their lands by defendants constitute of itself notice to them of the beginning of the running of the statute.

In *Hyson* v. *Dodge*, 198 Va. 792, 797, 96 S. E. 2d 792, Chief Justice Hudgins said:

"Neither the language nor the policy of the recording acts was intended to affect the holders of antecedent rights, but only such persons as are required to search the records to protect their own interests."

Cf. *Bridgewater Roller Mills Co.* v. *Strough*, 98 Va. 721, 724, 37 S. E. 290; *The Lynchburg Perpetual Building and Loan Co.* v. *Fellers*, 96 Va. 337, 343, 31 S. E. 505, 70 Am. St. Rep. 851.

In *McClanahan's Adm'r* v. *Norfolk & Western Ry. Co.*, 122 Va. 705, 774, 96 S. E. 453, this is said:

"The registry of a deed by a subsequent purchaser is no notice to parties who have acquired their rights before the time when the deed is registered."

See also *Cox* v. *Cox*, 134 Va. 307, 308, 114 S. E. 672.

It has been held, in cases involving cotenants or others originally having privity of title with the disseisor, that constructive notice of adverse possession "may be presumed from a great lapse of time with circumstances which may warrant such presumption." Such notice, like "any other fact, involved in a civil case, may be proved by circumstantial evidence, the probative value and sufficiency of the circumstantial evidence to sustain the burden of proof required (i.e., by a preponderance of the evidence), being entirely with the jury." *Baber* v. *Baber*, 121 Va. 740, 758, 94 S. E. 209; *Stonestreet* v. *Doyle*, 75 Va. 356, 378, 40 Am. Rep. 731; *Va. Coal etc. Co.* v. *Hylton*, 115 Va. 418, 424, 79 S. E. 337.

Here, the trial court held that the evidence only tended to indicate and serve notice of an intention to appropriate the fish or products of the pond to the dominion and ownership of the complainants and not the land itself; and that, in view of the lapse of time involved and the peculiar facts of the case, it did not sustain the burden of proof required either for ownership by adverse possession, or for the exclusive right of fishing by prescription.

We agree with the chancellor of the trial court that Mrs. Richardson was for a time apparently unaware of her legal rights, and that

there is no direct evidence that the other defendant landowners knew of, and acquiesced in, the claim of the complainants.

In principle, there is no great difference as to the acquisition of rights whether they be corporeal or incorporeal, except as the statute of limitations introduces the difference. *Cornett* v. *Rhudy*, 80 Va. 710. The tests as regards adverse possession are equally applicable to the acquisition of prescriptive rights. The possession of the claimant must be adverse under a claim of right, exclusive, continuous, uninterrupted, and with a knowledge and acquiescence of the owner of the estate in, over or out of which the right is claimed. *Improved Realty Corp. v. Sowers, supra; Powell v. Magee*, 191 Va. 315, 60 S. E. 2d 897; *Williams v. Green*, 111 Va. 205, 68 S. E. 253.

For the foregoing reasons, we are of opinion that the evidence is not sufficient to show that Mrs. Leake acquired either the waters and lands comprising Ball's Mill Pond by adverse possession, or the exclusive right of fishing in said pond by right of prescription. Accordingly, the decree appealed from is affirmed.

*Affirmed.*

HUDGINS, C. J., and SNEAD, J., dissenting.

SNEAD, J., dissenting.

The testimony was heard *ore tenus* by the trial court, and I am mindful that such conflicts as there may be in the evidence have been resolved in favor of appellees, yet upon careful scrutiny of the testimony, I find no material conflicts.

I am unable to agree with the majority opinion because it fails realistically to evaluate the convincing and conclusive evidence offered by appellants to prove adverse possession under color of title. It accords unjustified weight and importance to trivia offered by appellees to break the continuity of appellants' actual, open, visible, notorious and hostile occupancy and exclusive use of the property for the only purposes for which it was adaptable and for the necessary period of time. Sec. 8-5, Code 1950.

The origin of Ball's Mill Pond is not known but in 1824 James Ball owned 530 acres of land with the grist mill thereon, and it is agreed that the mill was the same one that was located upon the five acres of high land acquired by David H. Leake 105 years later. Nor

is there any evidence showing how or by what authority the pond was formed, but a dam now exists across its western end, in which is located a spillway adjacent to and bordering Leake's high land, over which spillway the water flows from the pond.

At times during the period between 1824 and 1929, a few deeds were executed and recorded conveying tracts of land adjacent to the pond, and in some of them it is recited that the grantors are heirs and descendents of James Ball and the tracts of land conveyed are described as bounded, in part, by Ball's Mill Pond. Yet no deed, other instrument or record in evidence purports to transfer or convey Ball's Mill Pond to anyone until it was conveyed by L. T. Rock to Paul L. Ruehrmund on December 14, 1923.

Though it be true that record title to the 19½ acre pond was not proved to be in L. T. Rock, yet he was concededly the owner of the water powered grist mill and the five acre tract of land upon which it was situate, along with all privileges and appurtenances incident to the acreage and mill. The deed of August 14, 1902, from Alex Stronach, et al., heirs and descendents of James Ball, to L. T. Rock described the five acres, more or less, of high land as bounded in part by the pond and conveyed the land, mill and "all privileges and appurtenances thereto belonging."

It also appears from the deed of December 14, 1923, from L. T. Rock, widower, to Paul L. Ruehrmund that the grantee acquired fee simple title to the five acres, more or less, bounded in part by the pond and upon which the mill was located, with all appurtenances, *and color of title to the pond in controversy.*

The grantor in that deed, after stating the boundary lines of the five acres upon which the mill was located and the description of the property granted, continues thus:

"* * * together with the unqualified and absolute right to maintain and have the dam and pond adjoining the above described tract of land, to the exclusive use and benefit of the party of the second part, his heirs and assigns forever."

This unqualified grant of the dam and pond by Rock, a cotenant with appellees, to Ruehrmund who theretofore had no rights or interests in the property and his entry thereon constituted disseisin of the other cotenants. If need be this disseisin was further accomplished, confirmed and made certain by the subsequent grants by Ruehrmund and those claiming through him of the pond to Eichel-

berger and Leake and their entry upon and control of the premises granted.

"It is well settled in this State that where a purchaser, if he be a stranger to the title, takes a conveyance of the whole estate in a tract of land, although his grantor was only a tenant in common with others, and in pursuance thereof enters into the exclusive possession of the land, claiming title to the whole, it is an ouster of the other co-tenants and the grantee so entering and claiming title may rely upon his adversary possession if continued the statutory period." *Virginia Coal and Iron Co.* v. *Hylton*, 115 Va. 418, 424, 79 S. E. 337; Sedgwick and Wait, *Trial of Title to Land*, § 286, p. 204; 2 Tiffany, *Real Property*, 2d ed., § 513, p. 2019; *Johnston* v. *Virginia Coal & Iron Co.*, 96 Va. 158, 31 S. E. 85; *Virginia Coal & Iron Co.* v. *Richmond & Clinchfield Coal Corp.*, 128 Va. 258, 104 S. E. 805; *Cochran* v. *Hiden*, 130 Va. 123, 107 S. E. 708; Annotations, 27 A. L. R. 8, 71 A. L. R. 444, 32 A. L. R. 2d 1214.

By each of the five deeds, beginning with that of Rock to Ruehrmund of December 14, 1923, and ending with the deed of Eichelberger to David H. Leake of May 15, 1929, recorded May 16, 1929, conveyance was made of the five acres bordering the pond, the mill situate on the high ground, the dam and appurtenances, in fee, and each deed also conveyed the pond to the respective grantee.

It is also most significant that George W. Johnson, a nearby resident and the only owner of land adjacent to and abutting the dam other than Sue Leake, testified and freely conceded that David H. Leake, her predecessor in title owned and controlled the dam as well as the 19½ acre pond.

Long prior to and during Rock's ownership of the five acres, mill, privileges and appurtenances, the only commercial use to which the pond and its waters were put was operation of the grist mill. However, while Eichelberger or Leake owned the property, operation of the mill ceased and it was never thereafter used, and the land, pond and improvements were used by them solely for fishing, hunting, and boating, the only uses to which they were then susceptible. Without the mill, which was closed about 1929 and later demolished, the pond was adaptable to no other uses.

A caretaker or keeper, George Wesley Clark, was placed on the premises while Eichelberger was the owner, and he was charged with the duty of keeping people from fishing in, or otherwise using, the pond. Clark was continued in that capacity by David H. Leake, and

from 1929 no one was allowed to use the pond or premises without Leake's written authorization.

Both keepers, George Wesley Clark, who with his wife and son occupied the house on the premises from early 1929 until 1936, and William J. Barton, who was secured as caretaker about a month after Clark moved from the premises and who occupied the house with his family and acted as caretaker from May of 1936 until 1951, prohibited anyone from using Ball's Mill Pond who did not present written permission from Leake to do so. During the time that Barton lived on the premises, he went around the pond frequently but found no evidence that anyone had been fishing from the shores. In fact the banks of the pond were set in dense growth of bushes and trees, and there was no path or approach to the pond during the twenty-two year period that Clark and Barton acted as caretakers except along the road, or entrances near the tenant house occupied by them and their families. On occasions Barton caught people fishing from the dam and required them to leave, but throughout the periods that Clark and Barton served as keepers, no boats were on the pond except those belonging to Eichelberger and Leake and their licensees. When Clark was at work or otherwise absent from the premises, his wife and child allowed no one to fish in the pond without a permit from David H. Leake, and this practice was adhered to during the fifteen or sixteen years that Barton served as caretaker.

Beginning in 1929 and throughout the ensuing years, no difficulty was encountered by Leake in his exercise of open, notorious, complete and exclusive control and dominion over the pond and its use until 1954, approximately three years after the caretaker, William J. Barton had moved and about a year before Leake's death. In 1954 or 1955 Leake was informed that some persons had been using the pond in his absence and without his permission, and during his last illness he asked his nephew to investigate and ascertain who were using the pond, which resulted in a revocation of the permit that he had given Bromley.

It is also significant that from the time that Rock conveyed the property to Ruehrmund in 1923 and throughout the time that subsequent grantees, including Eichelberger and Leake, held the property, no person expended any money or effort to stock the pond or maintain the dam and spillway other than those to whom the pond and dam had been conveyed, along with the mill and the five acres of high land.

In *Lyons* v. *Fairmont Real Estate Co.*, 71 W. Va. 754, 77 S. E. 525, 532, in stating the character of occupancy necessary to establish adverse possession, it is said:

"* * * The occupancy need not be such as physically to bar out trespassers, but only to manifest unequivocally a claim of ownership on the part of the occupant and preclude all others, not merely from trespassing upon it, but from using it as their own or in common with the claimant. Obviously this may be done in more than one way; and what acts are sufficient depends upon the condition of the land and its adaptability to use. * * *"

In *Zeilin* v. *Rogers*, 21 Fed. 103, 108, the principle is stated as follows:

"* * * Neither residence upon land nor its inclosure by artificial means is absolutely necessary to create an adverse possession, even where the premises are not claimed under color of title. Either of these circumstances is strong evidence to establish such possession; but it may be shown in other ways. A subjection of the land by the claimant to such uses as it is ordinarily susceptible of, to the exclusion of others, is an adverse possession; * * *."

In a letter of April 7, 1954, to Leake from Mrs. Fannie Richardson, an owner of land adjoining the pond and a nearby resident, she stated that she did not claim any of Ball's Mill Pond and that Leake owned it. George W. Johnson, likewise owner of land bordering on the dam and a nearby resident, testified that he recognized that Leake owned the pond; that he thought it was necessary to get a written permit from Leake to fish therein; that he did so, and that it was *common knowledge* that the pond belonged to Leake. This testimony proves that adjacent owners and others in the community considered Leake's possession and control to be absolute. These circumstances, along with the presence of Leake's keepers at the pond, for a period of 22 years with express directions to deny use of the pond and boats to all persons lacking written permission from Leake, show that Leake's exercise of exclusive use and control of the pond subsequent to his purchase was also actual, notorious and hostile.

In *Baber* v. *Baber*, 121 Va. 740, 759, 94 S. E. 209, recognition of constructive notice and declaration of its sufficiency is stated in the following language:

"However, the notice to or knowledge of the coparceners, or others originally having privity of title with the disseisor, of his disclaimer aforesaid and assertion of an adverse right, required to be

proved before the running of the statute of limitations will begin, need not be actual. It may be constructive. *Stonestreet* v. *Doyle*, 75 Va. 356, at p. 378; 40 Am. Rep. 731; *Va. Coal, etc. Co.* v. *Hylton*, 115 Va. at p. 424, 79 S. E. 337, Ann. Cas. 1915a, 741. It may be presumed from a great lapse of time and other circumstances which may warrant such presumption."

Corroborative of the fact that adjoining owners knew of the conveyance of the pond to Leake and his claim to its ownership, and that they asserted no rights therein or thereon is further shown by the testimony of William J. Dann. He, a resident of New York City, purchased part interest in a tract of land of 1,223 acres in 1939 that bordered on the pond. On his visits to Lancaster County in 1939 or early 1940, he "heard general discussion" that persons made claim to the control, or ownership, of the pond as a whole. He thereupon made an examination of the records and found the deeds to Eichelberger and Leake conveying to them the pond; yet neither he, nor the owners of the tract of land that they had acquired, made any claim or assertion of any rights in or to the pond.

The majority opinion states that Mrs. Eoline Ball Jesse "gave permission through the years to her friends to fish" in the pond and that her son, James D. Jesse, Jr., fished in the pond at times from 1930 to 1939. However, the opinion fails to state that the permissions given by Mrs. Jesse to her friends were given in 1925 or 1926, years prior to Eichelberger's and Leake's ownership and before a keeper was placed on the premises in 1928 or 1929. The unimportance of the testimony of James D. Jesse, Jr., and the fact that his approach to and presence on the wooded bank of the pond was clandestine and wholly unknown to the keepers is best disclosed by these extracts from his testimony:

"Q. Could you tell us when and under what circumstances you fished there please?

"A. Well, it was more or less when I was a boy. I was in there from about 1930, probably, on up to 1938 or 1939 that I hunted back there and fished as well back on this property, somewhere in those years.

\*        \*        \*        \*        \*        \*        \*

"Q. How often did you fish up there?
"A. Oh, possibly in the summer maybe a month or so, like that,

and maybe in the fall of the year I would go back hunting. It was more like walking. * * *

*     *     *     *     *     *     *

"Q. Were you fishing from the boat or what?

"A. I was on the shore and just most anything a kid could rig up, 12 or 15 years old, whatever was my way of fishing."

The fact that no permission was ever given by Mrs. Jesse, who lives two and one half miles from the pond, to any friend to fish in the pond after Eichelberger and Leake acquired it and placed keepers there to exclude all persons, and the circumstance that from 1930 to 1939, the youthful "Isaac Walton" who fished therein at times, never approached the pond from the road by the keeper's cottage but through densely wooded areas, are convincing circumstances tending to prove that Eichelberger and Leake's exclusive control and use of the pond was known and recognized by the adjoining owners. The conduct and actions of Mrs. Jesse and her son tend to strengthen and confirm the statement made by George W. Johnson that it was common knowledge that Leake owned the pond.

For the reasons stated I would reverse the decree and declare Sue Leake to be the absolute owner of the pond, free of any rights or interests of appellees.

HUDGINS, C. J., joins in this dissent.